Reed Wayne HAMILTON, Appellant,

v.

Crispus NIX, Warden, and Attorney General of the State of Iowa, Appellees.

No. 84–2089.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1985.

Decided Dec. 31, 1985.

**620**

John C. Wellman, Des Moines, Iowa, for appellant.

Thomas D. McGrane, Asst. Atty. Gen., Des Moines, Iowa, for appellees.

Before LAY, Chief Judge, ARNOLD and BOWMAN, Circuit Judges.

LAY, Chief Judge.

Reed Hamilton, an Iowa prisoner, was convicted of first degree murder and voluntary manslaughter in connection with the shooting deaths of Nick Pappas, Jr., and Cathy Larson. The Iowa Supreme Court affirmed his convictions on Hamilton's direct appeal. *State v. Hamilton*, 335 N.W.2d 154 (Iowa 1983). Hamilton petitioned for a writ of habeas corpus in federal district court[1] alleging that his convictions were obtained in violation of his fifth and sixth amendment rights by the admission of certain evidence. He further complained that he was denied due process of law by certain statements made by the prosecution at trial and by his conviction for first degree murder based on felony murder. The district court denied Hamilton's petition. This appeal followed.

Nick Pappas, Jr., and Cathy Larson were found dead of gunshot wounds in their Des Moines home on the evening of January 25, 1978. There was substantial evidence that Pappas regularly sold large quantities of drugs. Pappas had been shot twice in the back of the head with a .38 caliber revolver; Larson, three times with the same weapon. Their bodies were discovered by Nick Pappas' father and sister sometime between 5:30 and 6:00 p.m.

Shortly after 6:00 p.m., Reed Hamilton appeared at the home of a childhood friend, soaking wet and shaking violently. Hamilton told his friend that he had gone out on the river after an argument with his girlfriend, Diane Nystrom, and had fallen through the ice. The friend gave Hamilton some dry clothes, and, while Hamilton changed, counted out $279.00 Hamilton had with him at Hamilton's request. Hamilton soon left his friend's house, and arrived at his mother Maxine Hamilton's home sometime after 6:30 p.m.

Hamilton entered his mother's house carrying a suitcase. Both Maxine Hamilton and Paul Lincoln, a man with whom Maxine was living at the time, were present when Hamilton arrived. Hamilton took the suitcase down into the basement of the house and came back upstairs empty handed. After Hamilton left to pick Diane Nystrom up from work, Lincoln looked into the suitcase and found two plastic bags inside. Lincoln stated at trial that the bags contained "some kind of tobacco" with a strange smell.

The next day, a postal carrier reported to the police that windows were being broken out of Nystrom and Hamilton's West Des Moines home. A patrolman went to investigate the incident, and found Hamilton sitting in a car in front of the house, dressed only in a bathrobe. Hamilton told the officer that he lived there and that some people had been trying to kill him. Hamilton said that he thought one of them was Nick Pappas' brother. After additional police officers arrived, a search of the house was conducted. No intruders were found, but a bag of marijuana and an empty handgun holster were discovered. Hamilton was then arrested for possession and taken to the West Des Moines police station.

Hamilton was later transferred to the Des Moines police station where, after being advised of his *Miranda* rights, he was questioned about his activities during the previous day. The Iowa Supreme Court determined that Hamilton initially made the following statements to the police:

> [Hamilton] said he had gone to the victims' house between 3:00 and 3:30 p.m. on the day of the shooting and that Nick Pappas and Cathy Larson were there at the time. He said he purchased some marijuana from Pappas and left for home, where he and his fiancee, Diane Nystrum [sic], stayed until about 8:00 p.m. when they went shopping and to his mother's house before returning home. He stated that just prior to going to bed, Diane had seen a shadow outside the house and that he had gone upstairs to get his shotgun. He said he had sat up

1. The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

all night to protect the home with his shotgun. The officers then asked him if he had any guns besides the shotgun. Hamilton replied that he had a .38 caliber revolver and, when asked where it was, responded that it was "over to his mother's house."

*Hamilton*, 335 N.W.2d at 159. After Hamilton made these statements, all but one of the officers present left the interrogation room to prepare an application for a warrant to search Maxine Hamilton's home.

Hamilton then asked the officer who remained in the room to lock the door and confided that he "needed help." In response, the officer replied, "Tell us the truth and we will try to help you." The state judge who held the suppression hearing found this promise of leniency rendered the remainder of Hamilton's statement involuntary and inadmissible.[2] As recounted by the Iowa Supreme Court, following the officer's promise of leniency:

> [Hamilton] stated he had shot the victims and that he had taken approximately ten pounds of marijuana and one ounce of cocaine from the Pappas home; that he took the marijuana to his mother's home where he placed it in a suitcase and hid it in the basement, then he went to "a river" to dispose of the gun and, while walking on the ice, fell in.

*Hamilton*, 335 N.W.2d at 156. Hamilton then agreed to show the police where he had hidden the gun. It was decided, however, to wait until the next morning to act on this plan, because it was too dark to see.

Early the following morning, January 27, at approximately 5:00 a.m., Hamilton called his mother from jail. He asked that she remove the suitcase in the basement from her house. His mother told him that she knew he hadn't killed anyone, to which he replied, "oh yeah, but I did." Paul Lincoln was in the same room with Maxine when she received the call, and heard some of her side of the conversation. According to Lincoln, he and Maxine then went into the living room to talk. It is undisputed that Maxine later took the suitcase to the home of a family friend, Ann Morrison, and asked Morrison to keep it. Less clear is whether Paul Lincoln went with her.[3] The Iowa Supreme Court found, however, that "Lincoln's testimony also confirmed * * * that he and Maxine * * * took the suitcase to the home of Ann Morrison." *Hamilton*, 335 N.W.2d at 157.

The police arrived at Maxine Hamilton's home at 10:00 a.m. to execute the search warrant, prepared the night before, for locating marijuana and a .38 caliber gun. The search revealed neither the gun nor the marijuana. Maxine Hamilton initially denied that Reed had brought any marijuana into the house. Then one of the officers told her that the police knew Reed had carried ten pounds of marijuana into her house in a suitcase. Shortly thereafter, Maxine admitted, in response to direct questions, that Reed had brought a suitcase into the house and that she had removed it. She did not, however, divulge the location of the suitcase. The testimony is again conflicting, however, regarding

---

**2.** Both Hamilton and the state sought and obtained state appellate review of this ruling. In April, 1979, the Iowa Court of Appeals upheld the ruling, and the state petitioned for further review in the Iowa Supreme Court. The supreme court denied further review and issued an order to proceed on June 18, 1979. Descriptions of these earlier proceedings are set forth in *State v. Hamilton*, 309 N.W.2d 471, 474 (Iowa 1981) and *State v. Hamilton*, 335 N.W.2d 154, 156 (Iowa 1983).

The state has not sought to further defend the validity of the officer's conduct. It did not challenge the suppression order on Hamilton's direct appeal or in the course of habeas proceedings. The state's brief to the Iowa Supreme Court in Hamilton's direct appeal in fact characterized the officer's conduct as illegal.

**3.** The testimony on this point is somewhat confusing. Maxine Hamilton was never asked at trial whether Lincoln accompanied her. Lincoln testified that he went to Morrison's home only in the afternoon, when Maxine did make a second trip there to retrieve the suitcase. Morrison testified that she saw Lincoln only once when Maxine came to recover the suitcase. Lincoln did, however, testify that he went with Maxine to deliver the marijuana, and neither Hamilton's brief on appeal nor his counsel's argument to this court deny Lincoln's involvement in the early morning transfer of the suitcase.

what she may have said to the police about Hamilton's early morning telephone call. Maxine Hamilton testified that she lied to the police that morning, and specifically denied telling them anything about the phone call. There was some testimony, however, that she did relate the substance of the call to one officer.[4] In any case, all law enforcement personnel present testified that she was generally uncooperative.

In the meantime, Reed Hamilton had requested the assistance of an attorney who demanded that the police cease questioning Hamilton. Hamilton's attorney also sought and was granted a court order restraining the police from interrogating Hamilton further. The police subverted this order, however, by persuading Diane Nystrom to act as a conduit for their questions and to convince Reed to retrace the route he took following the killings. The officers told Nystrom that if she could induce Hamilton to cooperate, charges against him would be reduced and he would receive immediate psychiatric help. The officers also said they were afraid children would find the murder weapon if Hamilton did not recover it for them. Nystrom then agreed to do as the police asked. She spoke with Hamilton briefly, and then Nystrom and Hamilton got into a squad car with two police officers. They then travelled the path Hamilton followed the day of the killings, with the officers transmitting questions to Hamilton through Nystrom, and Hamilton in turn answering through her.[5] The officers, Nystrom and Hamilton eventually arrived at Maxine Hamilton's home. Reed Hamilton went to his mother and whispered to her that she should tell the police what she knew, and should retrieve the suitcase because the police were

going to help him. Maxine Hamilton and Lincoln later recovered the suitcase and delivered it to the police. They both also gave complete statements, including an account by Maxine Hamilton of her telephone conversation with her son.

There were two trials in this case.[6] Hamilton's invalidly obtained confession and any direct reference to the trip retracing Hamilton's path were excluded at both trials. Neither Maxine Hamilton nor Paul Lincoln testified at the first trial, although both had been subpoenaed for the limited purpose of identifying and discussing the .38 gun. Both were adjudged in contempt of court. Maxine Hamilton was sentenced to three months in jail, Paul Lincoln to six months. Ann Morrison also did not testify, and the ten pounds of marijuana were not admitted into evidence.

At the second trial, Lincoln and Maxine Hamilton were both served a subpoena and did testify. Ann Morrison also testified, and the suitcase of marijuana was admitted into evidence. Maxine Hamilton testified that Reed Hamilton had borrowed a hand gun from her sometime before the shootings, and that he had brought the marijuana into her house that evening. She also testified about the early morning telephone call she received from Reed in which he admitted shooting Pappas and had asked her to remove the marijuana from her basement. Paul Lincoln testified that Hamilton had brought the marijuana into the house, confirmed that Maxine had received the call from Reed, and stated that he and Maxine took the suitcase containing the marijuana to Ann Morrison's house. Morrison testified, too, that Maxine had brought the suitcase to her early that morning and that

4. The state supreme court made no findings on what Maxine did or did not say to the officers that morning.

5. The state judge ruled on Hamilton's motion to suppress that this procedure was improper and that any evidence received as a result of this activity was illegally obtained. The state again does not claim otherwise in these proceedings, and never appealed the ruling to the state supreme court.

6. The first trial resulted in convictions for first degree premeditated murder and voluntary manslaughter. Hamilton appealed these convictions. The Iowa Supreme Court reversed and remanded for a new trial, finding prejudicial error in the admission of certain statements by Diane Nystrom. *State v. Hamilton,* 309 N.W.2d 471, 476–79 (Iowa 1981). All references to testimony in this opinion relate to testimony taken at the second trial.

Maxine and Lincoln had retrieved it later in the day.

Defense counsel objected to the admission of Maxine's testimony of Reed's confession to her, all testimony relating to the storage, transfer, and retrieval of the marijuana and the marijuana itself, on the ground that it was inadmissible fruit of Hamilton's illegally obtained confession and the illegal trip. The state trial court overruled these objections, reasoning that the confession to Maxine and the evidence relating to the marijuana "had nothing to do with" the illegal police conduct. The trial court also denied Hamilton's motion for directed verdict of acquittal for felony murder in the death of Cathy Larson and overruled his objection to a felony murder instruction. Hamilton's motions for mistrial based on certain statements made by the prosecutor, including references to Hamilton's confession to his mother in opening and closing argument, were likewise denied. The jury convicted Hamilton of first degree felony murder for the death of Cathy Larson and voluntary manslaughter for the death of Nick Pappas.

The Iowa Supreme Court affirmed Hamilton's convictions on appeal. 335 N.W.2d 154 (Iowa 1983). The state court rejected Hamilton's contention that Maxine's testimony regarding his confession to her and the transfer of the marijuana was inadmissible, relying on the "independent source" exception to the exclusionary rule. The court reasoned that since the police were aware of Maxine Hamilton's identity and potential as a witness before any police illegality occurred, the admissibility of her testimony was unaffected by the subsequent acts of misconduct. *Hamilton,* 335 N.W.2d at 158–59. The testimony of Lincoln and Morrison was deemed admissible for the same reason, as their identities and value as witnesses came to light when the police pursued the investigation through Maxine Hamilton. *Id.* at 160. The state court also rejected Hamilton's claim that certain comments made by the prosecutor

warranted a mistrial. *Id.* at 160. Finally, the submission of the felony murder charge was held sufficiently supported by the evidence that Hamilton had killed Cathy Larson while perpetrating a robbery. *Id.* at 161.

The federal district court on habeas agreed and dismissed Hamilton's petition. The district court generally concurred in the state court's analysis of the admissibility of the challenged evidence. The district court also rejected Hamilton's argument that the state secured Maxine's cooperation in the investigation only by the illegal conduct, that she testified involuntarily, and that therefore her testimony should have been suppressed. Such an approach, the district court reasoned, would involve the court in the overly speculative task of probing a witness's subjective motivations, and would be contrary to the principle that the state has the right to every person's evidence. The district court also found no constitutional error in the challenged statements by the prosecutor and in the sufficiency of the evidence to support the conviction for felony murder.

On appeal to this court, Hamilton again challenges the admissibility of Maxine Hamilton's testimony of his confession to her, and the testimony given by Maxine, Lincoln, and Morrison regarding the ten pounds of marijuana. Absent their foundational testimony linking Hamilton to the marijuana itself, Hamilton also argues that the marijuana was inadmissible. For the following reasons, we agree that all of this evidence was inadmissible "fruit" of the police misconduct.

■ It is axiomatic that the exclusionary rule bars the admission of physical evidence and live witness testimony obtained through the exploitation of police illegality, *see e.g., Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–17, 97 L.Ed.2d 441 (1963), or, to invoke the metaphor, evidence that is "fruit of the poisonous tree." [7] Three exceptions to the

---

7. The Supreme Court has recently limited the scope of the "fruits" doctrine in certain cases

premised on alleged violations of the fifth amendment. In *Oregon v. Elstad,* —— U.S. ——,

exclusionary rule have been recognized, however, permitting the use of such evidence if the prosecution shows that it was or could have been secured "by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 487–88, 83 S.Ct. at 417. Evidence may be admitted if it has but an "attenuated link" to the underlying illegality, *United States v. Ceccolini,* 435 U.S. 268, 273–79, 98 S.Ct. 1054, 1058–62, 55 L.Ed.2d 268 (1978); *United States v. White,* 746 F.2d 426, 428 (8th Cir.1984), if it derived from a source independent of the illegal conduct, *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920), or if the evidence would inevitably have been discovered absent the illegality. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 2507–11, 81 L.Ed.2d 377, (1984); *United States v. Apker,* 705 F.2d 293, 306–07 (8th Cir. 1983).

■■■ The state contends that the challenged evidence was all sufficiently attenuated from Hamilton's illegally obtained statements to permit its admission.[8] In

*Ceccolini,* the Supreme Court set forth the analytical framework for evaluating whether live witness testimony falls within the exception. The Court deemed of paramount importance the extent to which "the basic purpose of the exclusionary rule will be advanced by its application" in a particular case. *Ceccolini,* 435 U.S. at 276, 98 S.Ct. at 1060. Relevant to that determination are the costs of permanently disabling a witness from testifying and the degree of free will exercised by the witness in testifying. *Id.* at 276–78, 98 S.Ct. at 1060–61. Where the cooperation of a witness is in fact the result of an exercise of the individual's free will, unaffected by police misconduct, the purpose of the exclusionary rule would not be served by disallowing the testimony. In determining the strength of the link between the illegality and a witness' testimony, *Ceccolini* directs us to consider the stated willingness of the witness to testify, the role played by the illegally seized evidence in gaining the witness' cooperation, the proximity between the illegal behavior, the decision to cooper-

105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Court held that the fifth amendment does not require the suppression of a confession, made after proper *Miranda* warnings and a valid waiver, solely because the police had obtained an earlier voluntary but unwarned admission from the suspect. 105 S.Ct. at 1298. The Court reasoned that "[w]hen neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Id.* at 1295.

*Elstad* has no bearing on this case, however. Here, the underlying illegalities involved threatening police tactics resulting in an involuntary confession and interrogation. Moreover, we conclude in this case that Maxine Hamilton and Paul Lincoln's testimony was also involuntary. Thus, since neither the "initial nor subsequent admission[s]" were voluntary with respect to their testimony, the *Elstad* analysis does not obtain.

The admissibility of Ann Morrison's testimony and the physical evidence of the marijuana is also unaffected by *Elstad.* This evidence was obtained by Hamilton's illegal interrogation resulting in Maxine's and Lincoln's agreement to disclose the location of the marijuana and deliver it to the police. Not only was the evidence thus involuntarily obtained, but the underlying conduct infringed Hamilton's sixth amendment

right to counsel. *Elstad* did not displace the "fruits" doctrine when underlying sixth amendment violations are involved.

8. The state also properly points out that the findings of the state court on factual questions are entitled to a presumption of correctness. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); 28 U.S.C. § 2254(d). We are therefore bound by the state court's finding that the police were aware of Maxine Hamilton's identity and potential as a witness prior to the occurrence of any police misconduct since that finding is supported by the record. While accepting these facts as true, we are not, however, bound by the state court's holding regarding the ultimate question of the constitutionality of admitting the evidence. Whether the evidence was attenuated, had an independent source, or would inevitably have been discovered are questions of federal law. *Cf. Miller v. Fenton,* —— U.S. ——, ——, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) (voluntariness of confession question of law subject to independent federal determination); *Mata,* 455 U.S. at 597, 102 S.Ct. at 1306 (constitutionality of pretrial identification procedures, not governed by § 2245(d)); *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980) (multiple representation by counsel); *Brewer v. Williams,* 430 U.S. 387, 403, 97 S.Ct. 1232, 1241, 51 L.Ed.2d 424 (1977) (waiver of counsel right).

ate and the actual testimony at trial, and the police motivation in engaging in the illegal conduct. *Id.* at 279–80, 98 S.Ct. at 1061–62; *see also United States v. Leonardi,* 623 F.2d 746, 752 (2d Cir.1980).

■ Applying these factors to the case before us, we conclude that they require the exclusion of Maxine Hamilton's testimony. Throughout the trial court proceedings, she repeatedly expressed her unwillingness to testify. She spent time in jail for contempt during the first trial to avoid giving testimony against her son. There can be no stronger statement of her unwillingness to cooperate than her refusal to do so. She appeared at the second trial again only under subpoena, and after spending three months in jail was well aware of the consequences of future defiance of the order. Testifying under threat of contempt cannot be deemed an expression of willing cooperation. *See United States v. Scios,* 590 F.2d 956, 961 (D.C.Cir.1978) (decision to testify a product of coercion when made under threat of contempt); *United States v. Houltin,* 566 F.2d 1027, 1037 (5th Cir. 1978) (Wisdom, J., dissenting) (testimony under threat of contempt obviously coercive); *cf. United States v. Stevens,* 612 F.2d 1226, 1230 (10th Cir.1979) (testimony voluntary when witness testified he cooperated out of a desire to change his lifestyle).

Further, the police misconduct played a crucial role in obtaining Maxine's initial cooperation. Hamilton's compliance with the officers, plainly the result of their misconduct, was used as "leverage" to gain her assistance. *See United States v. Rubalcava-Montoya,* 597 F.2d 140, 143 (9th Cir.1978) (witnesses directly confronted with evidence yielded by illegal search); *cf. United States v. Miller,* 666 F.2d 991, 996 (5th Cir.1982) (no evidence that police used illegally seized evidence in questioning witnesses); *United States v. Brookins,* 614 F.2d 1037, 1043 (5th Cir.1980) (same). Maxine became fully cooperative with the police only when Reed appeared at her doorstep, accompanied by the officers, and requested that she assist in the investigation because the police had offered to help

him. The officer's initial promise of leniency, together with the same promises made to Diane Nystrom, plainly motivated Hamilton's plea to his mother that she cooperate fully with the police. The illegal trip in turn created the opportunity for Hamilton to make the request face-to-face to his mother and without the advice of counsel. These circumstances suggest a "close, direct link between the illegal [conduct] and the testimony" ultimately given by Maxine Hamilton. *Rubalcava-Montoya,* 597 F.2d at 143.

It is true that Maxine Hamilton may have divulged some information incriminating Reed when the police were in her home executing the search warrant, before she was aware that Reed had been coerced into cooperating with the police. That she may have done so does not alter our analysis, however. She did tell them that Reed had brought a suitcase into the house and that she had taken it "somewhere." The police report indicates that she gave them this information, however, only after the police told her that they already knew Reed had hidden the suitcase there, information they had obtained during Hamilton's illegal confession. Again, these circumstances suggest a direct exploitation of Reed's confession in securing Maxine's statement. One of the officers also stated that Maxine told him the substance of Reed's 5 a.m. confession to her at that time. Maxine vigorously denied telling the officers this, however. In any event, given the strong showing in this case of the coercion necessary to compel Maxine to testify, we would consider such an admission of minimal significance to the ultimate question of the voluntariness of her testimony.

■ Our analysis of the proximity of the link between the illegally obtained confession and Maxine Hamilton's willingness to cooperate is also unaffected by the fact that the police were aware of her identity and potential as a witness before any misconduct occurred. The Iowa Supreme Court and the district court below relied on the officers' prior knowledge of her identity and involvement in Reed's activities in

holding her testimony admissible.[9] Certainly the extent of such independent knowledge may be a factor in evaluating the causal connection between her testimony and the illegal conduct. *See e.g., Leonardi,* 623 F.2d at 752; *United States v. Schaefer,* 691 F.2d 639, 645 (3d Cir.1982); *United States v. Cella,* 568 F.2d 1266, 1286–87 (9th Cir.1977). That her identity had been discovered, however, does not mean that the substance of her testimony, and her willingness to give it, had likewise been secured. As the Court in *Ceccolini* stated, "[t]he fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give." *Ceccolini,* 435 U.S. at 277, 98 S.Ct. at 1060 (quoting *Smith v. United States,* 324 F.2d 879, 881–82 (D.C.Cir.1963) (Burger, J.)). Again, given the strength of the evidence of the involuntariness of Maxine Hamilton's testimony, we do not view her prior identification as a potential witness of particular weight.[10]

*Ceccolini* also requires us to consider the length of time between the illegal conduct, the decision to cooperate, and the actual testimony at trial in evaluating the voluntariness of a witness's testimony. This consideration goes to the probability that a long span of time between these events afforded the witness a chance for extended reflection indicating that the testimony ultimately given was the product of free choice. *See Ceccolini,* 435 U.S. at 279, 98 S.Ct. at 1061; *United States v. Mergist,* 738 F.2d 645, 648 (5th Cir.1984); *United States v. Hooton,* 662 F.2d 628, 633 (9th Cir.1981). In this case, there was over a three year lapse between the time Maxine Hamilton was wrongfully induced to cooperate and the time of her subpoenaed testimony. One might reason that this long delay supports an inference that considerations unrelated to the police misconduct intervened to dispel her original determination to protect her son. However, there exists nothing in the record to demonstrate any such change in her attitude.

Finally, the last *Ceccolini* factor, the police motivation in engaging in the improper conduct, also weighs in favor of exclusion. The promises made to induce Hamilton's confession, and the officers' blatant disregard of Hamilton's counsel's request not to question him further appear to have been directed in large part at discovering such valuable testimony. In such circumstances, *Ceccolini* suggests that even willing testimony may be inadmissible. *See Ceccolini,* 435 U.S. at 276 n. 4, 98 S.Ct. at 1060 n. 4 (voluntariness may be differently weighed when illegal conduct is engaged in for the specific purpose of discovering potential witnesses). Moreover, the Supreme Court has recently noted that an assessment of the flagrancy of police misconduct is an important step in evaluating the deterrent effect of exclusion. *United States v. Leon,* — U.S. —, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677 (1984). It could not have escaped the officers that Hamilton would convey the same enthusiasm for cooperation to his mother when they met during the illegal excursion that he himself showed as a result of their promises of leniency. We hold, therefore, for all of the above reasons, that the ultimate purposes of the exclusionary rule would be served by

---

**9.** This information was gained by the police in the portion of Hamilton's statement made before the promise of leniency occurred.

**10.** We thus cannot agree with the district court's view that the degree of free will exercised by Maxine Hamilton in testifying must be deemed irrelevant. The district court considered such an inquiry an invitation to inappropriate speculation into subjective states of mind. However, it seems clear that the factors set forth in *Cec-* *colini* for evaluating the admissibility of her testimony require such an inquiry. Further, we also do not agree that evaluating motivation would "run counter to the ancient principle of law that the public has a right to every person's evidence," as the district court believed. We consider of greater relevance the proposition that the state does not have the right to exploit evidence gained in violation of an accused's constitutional guarantees.

exclusion of Maxine Hamilton's unwilling testimony.[11]

■ We next turn to the issue of the admissibility of Paul Lincoln's testimony. His testimony established that Reed had brought a large quantity of marijuana into the house, that Maxine had received a phone call from Reed in the middle of the night, and that he and Maxine had delivered the marijuana to Ann Morrison. The Iowa Supreme Court concluded that Paul Lincoln's testimony was admissible, since his identity and potential value as a witness were discovered through Maxine Hamilton, not the police misconduct. We do not dispute that the police legally discovered his identity, but we again find difficulty in the admission of his testimony under *Ceccolini*.

On the surface, the circumstances surrounding Paul Lincoln's testimony suggest more persuasive reasons for admitting his testimony than Maxine Hamilton's testimony. There is, in Lincoln's case, "evidence that [he] was completely uncooperative when originally discovered * * * but later changed his attitude and supplied the necessary information." *United States v. Parker*, 722 F.2d 179, 185 (5th Cir.1983) (quoting *United States v. Marder*, 474 F.2d 1192, 1196 (5th Cir.1973)). He did state at trial that he was testifying willingly, and that he would have testified at the first trial except that his lawyer "asked him not to."

A witness's stated willingness to testify, however, is just one of the factors to be considered under *Ceccolini*. In all other respects, Paul Lincoln's testimony was derived and was given under circumstances identical to the circumstances surrounding Maxine Hamilton's testimony. Like Maxine Hamilton, he testified only under subpoena at the second trial after having spent time in jail for contempt for refusing to testify at the first trial. Lincoln did state at the second trial that he would have told the police officers anything they wanted to know during the initial investigation. However, the record discloses that the police did question Lincoln when they executed the search warrant and that he was even less cooperative than was Maxine Hamilton at that time. Lincoln accompanied Maxine to retrieve the marijuana and gave his statement to the police only after Hamilton, at Nystrom's request, sought his mother's cooperation. Thus, the nexus between the illegal conduct and Lincoln's cooperation is at least as compelling in his case as it is in Maxine Hamilton's.

Further, the conduct of the police in seeking evidence about the marijuana was particularly flagrant. During the execution of the search warrant, one of the officers specifically said they knew about the marijuana in order to induce Maxine Hamilton and Lincoln to speak. This information came directly from Reed Hamilton's confession and was no doubt the kind of evidence the police were motivated to uncover in making the promises to Hamilton in the first place. Under these circumstances, where the police misconduct arose from a desire to find just the sort of evidence ultimately adduced through Lincoln's testimony, the significance of the witness's stated willingness to testify is further diminished. *See Ceccolini*, 435 U.S. at 276 n. 4, 98 S.Ct. at 1060 n. 4. We therefore conclude that Paul Lincoln's testimony was also inadmissible fruit of the unconstitutional police conduct.[12]

Finally, the state presents no evidence suggesting that, absent the testimony of Maxine Hamilton or Paul Lincoln, Ann Morrison would have been identified or come forward as a witness. Nor is there any evidence that the police would have or

---

**11.** For the same reasons, we reject the state's contentions that her testimony was admissible under the independent source or inevitable discovery exceptions to the exclusionary rule. Our conclusions that her cooperation was inextricably linked with the underlying misconduct and that her ultimate testimony was coerced preclude the application of these exceptions to her own testimony.

**12.** The state does not argue, nor could we conclude, that Lincoln's testimony had an independent source or would have inevitably been discovered.

could have located the marijuana and uncovered sufficient foundational evidence linking it to Hamilton and the scene of the crime to permit its admission at trial. In sum, we hold that all of the challenged testimony and physical evidence should have been excluded and was improperly admitted.

 We must yet determine whether, given that this unconstitutionally obtained evidence was improperly admitted, its use at trial was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968); *Stump v. Bennett*, 398 F.2d 111, 121 (8th Cir.1968). The state produced considerable evidence tending to show that Hamilton was at the Pappas residence near the time of the shootings and that Pappas was Hamilton's drug supplier. It was also undisputed at trial that Hamilton had used substantial amounts of cocaine the day of and day after Pappas and Larson were killed, and that he had a gun similar to the one used to kill them. However, the state placed considerable reliance on Hamilton's early morning confession to his mother in establishing that Lincoln had killed Pappas and Larson. The prosecutor, in fact, near the end of his closing argument reminded the jury that the "one person you don't lie to is your mother." Further, the suitcase of marijuana was crucial to the state's theory of motive. The prosecutor plainly sought to convince the jury that Hamilton had killed Pappas to get the drugs. Finally, the marijuana played a pivotal role in the state's proof that a robbery had occurred, the underlying felony supporting the felony murder conviction for the death of Cathy Larson. Given the key role the challenged testimony and physical evidence played in the prosecution's case, we hold that the constitutional error in admitting this evidence was not harmless beyond a reasonable doubt.[13]

The judgment of conviction is vacated; the cause is remanded to the district court to grant the writ of habeas corpus unless the state provides a new trial for the petitioner within a reasonable period of time as determined by the federal district court after consultation with counsel for the respective parties.

BOWMAN, Circuit Judge, dissenting.

Hamilton stands convicted of a double homicide. His guilt is not in question. Today's decision renders inadmissible much of the evidence against him and probably means that he soon will be released from

---

**13.** Hamilton also challenges his conviction on the basis of certain statements made by the prosecution in opening and closing argument. We find no prejudicial constitutional error in the prosecutor's remark in closing argument that there was ample evidence that Hamilton committed first degree murder in the killing of Nick Pappas, where he had only been charged with voluntary manslaughter. Both the Iowa Supreme Court and the federal district court concluded that this remark was sufficiently cured by the immediate admonition from the trial judge to disregard it, and we do not disturb that conclusion here.

Hamilton further contends that the prosecution's reference in opening and closing argument to Hamilton's confession to his mother and to the ten pounds of marijuana denied him due process of law. The state court and the federal district court disagreed, based on their identical conclusions that the evidence supporting those statements had been properly admitted. Our contrary conclusion that that evidence was inadmissible necessarily dictates that these remarks were improper. We need not reach the question whether these comments in themselves would constitute grounds for reversal, however, since the improperly admitted evidence provides a sufficient basis for our disposition.

Finally, Hamilton has challenged his conviction for felony murder of Cathy Larson on the ground that the evidence was insufficient for a reasonable jury to conclude that a robbery had been committed. *See Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979). We find no error in the conclusions of the state supreme court or the district court that the overall circumstantial proof before the jury in this trial was sufficient for a jury to reasonably infer that Hamilton had robbed the Pappas home of the ten pounds of marijuana. We pass on this issue in favor of the state on the assumption, however, that all of the evidence admitted would allow the jury to make such a finding. We do not intend to suggest by this conclusion what our ruling might be on this question once the evidence ruled inadmissible in this opinion is stricken from the record.

prison, after serving only a little more than four years of a life sentence. I do not believe that Hamilton has been deprived of any constitutionally protected interest requiring us to inflict this kind of injury upon the public interest. Accordingly, I respectfully dissent.

With respect to the "fruit of the poisonous tree" argument, the Iowa Supreme Court found as follows:

> The police interrogation of Hamilton must be divided into two distinct segments, that preceding the suggestion of help and that following it. The interrogation began at police headquarters at approximately 9:20 p.m. on the day following the shooting. Hamilton was properly advised of his *Miranda* rights, and no issue is raised in that regard. The interrogation continued without a problem until approximately 11:00 p.m., when the suggestion of help was made, and the tainting of the confession allegedly occurred. During this pre-tainting segment of the interrogation, Hamilton furnished considerable information. He said he had gone to the victims' house between 3:00 and 3:30 p.m. on the day of the shooting and that Nick Pappas and Cathy Larson were there at that time. He said he purchased some marijuana from Pappas and left for home, where he and his fiancee, Diane Nystrum, stayed until about 8:00 p.m. when they went shopping and to his mother's house before returning home. He stated that just prior to going to bed, Diane had seen a shadow outside the house and that he had gone upstairs to get his shotgun. He said he had sat up all night to protect the home with his shotgun. The officers then asked him if he had any guns besides the shotgun. Hamilton replied that he had a .38 caliber revolver and, when asked where it was, responded that it was "over to his mother's house." (Investigation of the killing had established that a .38 caliber weapon had been used.) Immediately following the defendant's statement about his revolver being at his mother's house, several of the officers left the interrogation room to type up a search warrant application for the mother's house, apparently for the gun and marijuana. It was at this point, when the other officers had left, that Hamilton asked the remaining officer to lock the door and confided to the officer that he "needed help." The officer's response that he would try to help, according to the trial court's suppression order, then tainted the remainder of the statement.
>
> Before the tainting occurred, the identity and possible involvement of Hamilton's mother were known to the officers. The later, tainted, portion of the statement, more clearly focused on the extent of her involvement and contradicted portions of his earlier statement as it pertained to her. For example, in the second half of his statement, he said the gun was not at his mother's house as he originally said but was, in fact, on the bottom of a river. Nevertheless, at the point at which the tainting occurred, the police had already learned about the mother's involvement; their investigation was far from an aimless search for evidence which was dependent for direction upon anything Hamilton said later. The police knew at that point the mother's house had figured prominently in Hamilton's activities the previous day and had good reason to believe both the marijuana and murder weapon could be found there.

*State v. Hamilton*, 335 N.W.2d 154, 159 (Iowa 1983). Based on these findings, the Iowa Supreme Court concluded that the identity of Mrs. Hamilton was obtained through a source independent of the tainted confession, and that her testimony thus properly was admitted at trial. Likewise, the court concluded that the testimony of Paul Lincoln and Ann Morrison properly was admitted for the same reason, since these individuals came to light only when the police pursued their leads through Mrs. Hamilton.

Examination of the opinion of the Supreme Court of Iowa leaves no room for doubt that the court made its findings within the proper framework of controlling le-

gal principles. I would treat the court's ultimate findings regarding the applicability of the independent source doctrine, as well as the court's subsidiary findings, as determinations of factual issues within the meaning of 28 U.S.C. § 2254(d), and thus would accord them the statutory presumption of correctness.

In my view, a proper allocation of authority between the state courts and the federal courts requires that the section 2254(d) presumption of correctness be applied to the determinations that the Iowa Supreme Court has made. It is not contended that any of the section 2254(d) exceptions applies, and it is plain that the findings of the Iowa Supreme Court are fairly supported by the record. The Iowa Supreme Court is a "State court" for purposes of section 2254(d), and clearly it held a "hearing" within the meaning of section 2254(d). *See Sumner v. Mata,* 449 U.S. 539, 545–46, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). Nothing in *Miller v. Fenton,* —— U.S. ——, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), or any of the other cases cited in today's majority opinion, speaks directly to the issue of whether a finding concerning the independent source doctrine is to be treated as a matter for independent federal determination, and language used by the United States Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (adopting the inevitable discovery doctrine) strongly suggests the contrary. "If the prosecution can establish *by a preponderance of the evidence* that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Id.* 104 S.Ct. at 2509 (emphasis added). And as the Supreme Court pointed out in *Miller v. Fenton,* "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." —— U.S. at ——, 106 S.Ct. at 451 (citing *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 534, 99 S.Ct. 2971, 2977, 61 L.Ed.2d 720 (1979) (finding of intent to discriminate is subject to "clearly erroneous" standard of review)).

The Supreme Court noted in *Miller v. Fenton* that it has "yet to arrive at 'a rule or principle that will unerringly distinguish a factual finding from a legal conclusion.'" —— U.S. at ——, 106 S.Ct. at 451 (quoting *Pullman Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982)). This problem is a particularly sensitive one in federal habeas review of state court convictions. Federal courts should recognize the difference between their role when review is collateral and their role when the supervisional standard comes into play on direct appeal. The opportunity to litigate in the state courts an issue as factbound and as imprecise as "independent source" strongly suggests that collateral review by federal courts frequently is redundant, as I believe it to be in the present case.

Even assuming, *arguendo,* that the matter is one for independent federal determination, the majority opinion is not faithful to the principle that a federal habeas court should "give great weight to the considered conclusions of a coequal state judiciary." *Miller v. Fenton,* —— U.S. at ——, 106 S.Ct. at 451. Instead, reviewing the same record and putting its own spin on the facts, the majority opinion reaches conclusions diametrically opposed to the considered conclusions of the Iowa Supreme Court. The result is not to prevent a miscarriage of justice—the historic purpose of the Great Writ—but to perpetrate one.

I would affirm the judgment of the District Court.