The **UNITED STATES of America, Plaintiff,**

v.

**Wendell JUSTICE, Defendant.**

**No. IP 94–86 CR.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 5, 1994.

---

Donna R. Eide, Asst. U.S. Atty., Indianapolis, IN, for plaintiff.

Jack F. Crawford, Indianapolis, IN, for defendant.

ENTRY

BARKER, Chief Judge.

The Defendant, Wendell Justice, is charged in this case with conspiracy to distribute cocaine in excess of 5 Kilograms, money laundering and possession of a firearm in relation to a drug trafficking offense. This matter is currently before the Court on the Defendant's Motion to Suppress Testimonial and Physical Evidence, and he has signed a qualified plea that is conditioned on the outcome.

## I. FACTUAL BACKGROUND

The Government's arrest of Justice was the culmination of two separate investigations involving the Internal Revenue Service ("IRS") and the Indiana State Police ("ISP").

### A. IRS Investigation:

The first investigation was conducted by Special Agent Daniel Neukam ("SA Neukam") of the Internal Revenue Service. In December of 1992, SA Neukam began investigating a Jeffrey Alexander for involvement in cocaine trafficking and money laundering in Indianapolis, Indiana. SA Neukam believed that Alexander had used illegal proceeds to make an $80,000 cash down payment on a night club called the "Palladium." After obtaining both arrest and search warrants, Agent Neukam—along with members of the ISP—arrested Alexander on November 18, 1993. Upon questioning Alexander later that day, Neukam learned that the money used to purchase the Palladium was obtained, at least in part, from cocaine sales in Indianapolis. Alexander revealed that the source of the cocaine was the nephew of a woman named Michelle Simmons. This nephew, whose name was Willie Johnson, came to Indianapolis from Salt Lake City and stayed with Simmons at her residence on Denny Street in Indianapolis. Over the course of several debriefings, Alexander identified the other persons involved in the distribution of cocaine as Javier Armenta–Baeza, Harvest Buddy Thomas, John Robert Carter, Charles O'Neal and Louis Jordan.

### B. ISP Investigation:

Separate from the IRS investigation of Alexander, officers with the ISP Major Drug Section had been investigating the importation of marijuana through the Holiday Inn located at 6990 Shadeland Avenue in Indianapolis, Indiana. On November 9, 1993, Holiday Inn management notified Trooper Dean Wildauer that a suspicious looking hispanic male identified as Jose Armenta–Baeza had checked into room 506 of the hotel that evening. Armenta–Baeza had arrived at the hotel in a 1994 Chevy van that had been leased in Hobart, Indiana, by the Defendant Wendell Justice. Wildauer also contacted authorities in Utah and learned that Armenta–Baeza was a suspect in cocaine trafficking investigations in that state.

Trooper Jeff Sego was assigned to intercept the rental van the next day. He located the van at the home of Michelle Simmons on Denny Street in Indianapolis. When a male entered the van and pulled away, Trooper Sego pursued and pulled the vehicle over. The driver identified himself as Wendell Justice. Sego conducted a search of the van and found a pistol in the glove compartment. Justice was arrested for carrying a handgun without a permit. Police searched the van and confiscated a briefcase that contained various items.

On the same day, ISP troopers obtained a search warrant for Baeza's room at the Holiday Inn. A search of Baeza's room revealed information linking Baeza to Alexander as well as addresses and telephone numbers of persons in California and Utah believed to be involved in a drug conspiracy. Police also monitored phone calls from the room and tracked a telephone number to Michelle Simmons.

### C. Prior Proceedings:

On February 11, 1994, Justice was arrested on federal charges for being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g). On March 9, 1994, a federal grand jury indicted him for that offense, Cause No. IP 94–41–CR. Shortly thereafter, Justice filed a motion to suppress evidence obtained from the ISP's November 10 search of his van. On April 12, 1994, after an evidentiary hearing, the Honorable S. Hugh Dillin issued an order granting defendant's motion and quashing the evidence seized from Justice's van on November 10, 1993. As a result, on May 27, 1994, the government moved to dismiss the handgun case against Justice. By a stipulation of the parties, Judge Dillin's ruling is the "law of the case" before us.

On May 25, 1994, Justice and several codefendants were indicted in this case on several additional counts. Specifically, Justice was charged with conspiracy to distribute cocaine in excess of 5 Kilograms, 21 U.S.C. § 846, money laundering, 18 U.S.C.

§ 1956(a)(1)(A)(I), and possession of a firearm in relation to a drug trafficking offense, 18 U.S.C. § 924(c). He now moves to suppress any testimonial and physical evidence that he claims are the fruits of the illegal search of his van. For the reasons stated below, his motion is denied in part and granted in part.

## II. DISCUSSION

The Court's task today is to determine whether the government exploited evidence it illegally obtained from its November 10, 1993, search of Justice's van. According to the Defendant, "but for" the illegal seizure of this evidence, federal agents would not have made the connection between the IRS and ISP investigations. Justice contends that the government then confronted his alleged coconspirators with this ill-gotten evidence, thus inducing their cooperation in the investigation. As a result, he argues that the co-conspirators who have cooperated with the government should not be allowed to testify against him. Likewise, any physical evidence obtained as a result of the search of the van should also be suppressed.

### A. Fruits of Illegal Searches:

Once an illegal search is established, the government bears the burden of showing by a preponderance of the evidence that the evidence it seeks to introduce falls within an exception to the exclusionary rule. *United States v. Rodriguez*, 831 F.2d 162, 167 (7th Cir.1987). Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. *Segura v. United States*, 468 U.S. 796, 803–05, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The exclusionary rule also reaches evidence later discovered and found to be derivative of an illegality. *Nardone v. United States*, 308 U.S. 338, 341–43, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). In order to determine whether evidence indirectly obtained is the fruit of a prior illegality, the Court must examine whether the challenged evidence was "come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable*

to be purged of the primary taint." *Segura*, 468 U.S. at 804, 104 S.Ct. at 3385 (citations omitted) (emphasis in original).

In accordance with these principles, the Supreme Court has formulated at least three exceptions to the exclusionary that are relevant to our discussion. First, the exclusionary rule has no application when the Government learned of the evidence from an independent source. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Nor does the exclusionary rule apply where the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Finally, "illegally obtained evidence that is normally suppressed under the exclusionary rule may be admitted if it would have been discovered even without the unlawful police activity." *United States v. Fialk*, 5 F.3d 250, 252 (7th Cir.1993).

### B. Suppression of Testimonial Evidence—

Defendant Justice moves the Court for an order suppressing the testimonial evidence of Javier Jose Armenta–Baeza, Manuel Armenta–Baeza, Salvador Garcia–Baeza a/k/a "Chava," Charles O'Neal, Harvest Buddy Thomas, III, a/k/a "T–Baby," John Robert Carter, Willie Johnson, Louis Jordan and Jeffrey K. Alexander.

#### (1). Testimony of Jeffrey K. Alexander.

The most important witness whose testimony Justice seeks to suppress is Jeffrey Alexander. Both sides agree that Alexander was the subject of an independent IRS investigation into money laundering and cocaine trafficking at the time of his arrest on November 18, 1993. (Defendant's Memorandum in Support of Motion to Suppress, at p. 3). Justice contends, however, that SA Neukam and several IPS investigators used the illegally-obtained evidence to connect Alexander to Justice and to induce him to cooperate with the government. According to Justice, "[b]ut for the seizure of evidence from Justice's rental van and briefcase, federal agents

would not have made the connection between the Salt Lake conspiracy and Justice and Jeffrey K. Alexander." (Memo in Support of Motion to Suppress, p. 7).

■ The Court begins by noting that in order to suppress this evidence, a mere allegation that "but for" the illegal search, the police would not have made an evidentiary connection is insufficient. Indeed, in *Wong Sun v. United States,* the Supreme Court declined to "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

■ Moreover, courts are especially hesitant to exclude testimony of a live witness: "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advance to support suppression of an inanimate object." *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). According to the Supreme Court:

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence.... [T]he illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

*Id.* at 276–77, 98 S.Ct. at 1060. Thus, in order to exclude the testimony of a live witness, "a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278, 98 S.Ct. at 1061.

■ In light of this caselaw and after careful consideration of the narrative and testimonial evidence submitted to the Court, we find that the government's discovery of the connection between Justice, Alexander and the Salt Lake conspiracy was the product of an independent investigation. Our conclusion is based on at least three separate findings.

First, the government has demonstrated that SA Neukam was unaware of both Wendell Justice and also the contents of his briefcase when Alexander revealed his connection to the Salt Lake conspiracy on November 18, 1993. We find Neukam's testimony credible that he did not learn of the briefcase until January, ultimately taking custody of it on January 20, 1994. Nor had he heard the name Wendell Justice before Alexander mentioned it in their November 18, 1993, interview. Indeed, he stated that he lost interest in the portion of the debriefing that focused on the Salt Lake group because he was more interested in Alexander's purchase of the Palladium. Thus, because he was unaware of this evidence, Neukam's discovery of the connection between Alexander and the Salt Lake group cannot be characterized as the "exploitation of [the initial] illegality." *Segura,* 468 U.S. at 804, 104 S.Ct. at 3385 (citation omitted).

Significantly, Neukam's testimony is corroborated by other witnesses. For example, ISP Trooper Alfred W. Lux states in a sworn declaration that he transferred Justice and his belongings to the Marion County Lock-up for booking after Justice's arrest on November 10, 1993. Because the briefcase was too large to fit inside the lockers there, the booking officer refused to take custody of it. As a result, Lux returned the briefcase to the ISP Post and left it without paperwork in a locker. Connie Faust, an ISP evidence clerk, testified that she found the briefcase several weeks later and turned it over to Trooper Dean Wildauer some time in late December in order to ascertain its owner. Wildauer then gave the briefcase to Trooper Houck on January 5, 1994. Thus, by all accounts the briefcase and its contents were not in Neukam's possession until weeks after his November 18, 1993, interview of Alexander.

Although Neukam did not take possession of the briefcase until after Alexander first disclosed his connection to the Salt Lake group, the Defendant implies that Neukam was nevertheless aware its contents and the connection between Alexander and the Salt Lake group before Alexander volunteered

that information. In his cross examination of the several officers involved in the two investigations, the Defendant demonstrated that a close working relationship existed between SA Neukam and members of the ISP. In particular, Neukam testified that he had worked closely with Trooper Daniel S. Moore in the past. Moreover, Troopers Moore, Kenneth C. Houck and Wildauer all were present at Alexander's arrest and subsequent interview.

However, the mere fact that Neukam and officers of the ISP often cooperated on certain investigations does not establish that SA Neukam was aware of the briefcase's contents on this occasion. Indeed the overwhelming weight of the evidence demonstrates just the opposite. As already stated, Neukam did not learn of Justice's briefcase until January of 1994. Nor could Neukam have learned of its contents any sooner from Trooper Moore, who testified that he was first made aware of the briefcase in a January meeting with the U.S. Attorney. Likewise, Troopers Houck and Wildauer only became aware of the briefcase in early January when they attempted to ascertain who owned it and why it lacked the proper paperwork. In short, SA Neukam had neither seen the briefcase nor heard about its contents before his November 18, 1993, interview of Alexander.

Second, even if Neukam were aware of any evidence obtained unlawfully from the November 10 search of Justice's van, the Court finds that the government did not exploit that evidence by confronting Alexander with it during his November 18 interrogation. Neukam, for example, testified that he did not confront Alexander with any such evidence at that time. Alexander himself admitted that the police never told him they found his name in Justice's briefcase or in Baeza's address book. This testimony was corroborated by Trooper Wildauer, who stated that Alexander volunteered to talk about his connections to the Salt Lake group without any prompting. Indeed, Alexander admitted that he initiated the conversation

about Justice, Michelle Simmons, Louis Jordan and the other members of the Salt Lake conspiracy.

In short, the government demonstrated that it discovered Alexander's connection to Justice and his coconspirators through independent means. Neukam was unaware of the illegal search and subsequent seizure of the briefcase at the time of Alexander's initial cooperation. Nor could he have learned of the briefcase's contents from Troopers Moore, Houck or Wildauer, who—because the briefcase had been misplaced—were also unaware of its contents at that time. Finally, all the officers and Alexander are in agreement that regardless of who knew what when, Alexander was not confronted with that evidence on November 18.

■ Third and finally, even if the government later confronted Alexander with unlawfully obtained evidence during their February–March, 1994 debriefings, the connection between the initial illegality and Alexander's testimony has become sufficiently weak so as to dissipate the taint.[1] The Supreme Court in *Ceccolini* stressed the following factors in applying the "attenuated basis" exception to live-witness testimony:

(1) whether the testimony given by the witness was an act of her own free will and was not induced through the use of illegally-obtained evidence;

(2) whether the illegally-obtained evidence was used in the questioning of the witness;

(3) whether substantial time passed between the illegal search and contact with the witness;

(4) whether the police knew of the identity of the witness and her relationship with the defendant before the search; and

(5) whether there is evidence that the officers made the illegal search with the intent of finding a willing and knowledgeable witness to testify against the defendant.

*Id.* 435 U.S. at 275–81, 98 S.Ct. at 1060–62; *see also United States v. Ramirez–Sandoval,*

---

1. Justice points out that much of what the government learned from Alexander occurred in February–March debriefings. Because SA Neukam had begun coordinating his investigation

with Troopers Houck and Moore of the ISP at the time of these debriefings, Justice argues that tainted fruit subsequently was used to induce or coerce his cooperation.

872 F.2d 1392 (9th Cir.1989); *United States v. Mergist,* 738 F.2d 645 (5th Cir.1984).

The first factor examines whether Alexander's decision to testify was of his own free will. The Court concedes that Alexander's involvement with the drug conspiracy makes it doubtful that he would have come forward of his own accord. *See United States v. Padilla,* 960 F.2d 854, 863 (9th Cir.1992). However, there is not a *per se* rule limiting *Ceccolini* to "good citizen" witnesses who testify out of a sense of civic duty. *Ramirez–Sandoval,* 872 F.2d at 1399 (citations omitted); *United States v. Hoffman,* 385 F.2d 501, 504 (7th Cir.1967) (witness discovered as the result of an illegal search allowed to testify because his decision to plead guilty was an independent decision "over which the government could exercise no control"). Rather, the inquiry is whether the tainted evidence from the search was used to coerce or induce Alexander to testify. *Hamilton v. Nix,* 781 F.2d 619, 626 (8th Cir.1985); *United States v. Hooten,* 662 F.2d 628, 632 (9th Cir.1981).

In that light, the Court finds that the discovery of Alexander's name and phone number among the items in Justice's briefcase and Baeza's address book was not a pivotal factor motivating him to cooperate. The IRS had already accumulated a sizable body of evidence against him as a result of its money-laundering investigation. Indeed, as Alexander admitted in his testimony, he had "numerous reasons" for his cooperation. (Transcript of Suppression Hearing, Alexander Excerpt at p. 5). Moreover, Alexander exhibited a willingness to cooperate as soon as he was arrested. Therefore, even if he were eventually confronted with this illegally-obtained evidence, the cat was already out of the bag. Accordingly, we find that factor # 1 weighs in favor of admitting Alexander's testimony.

Factor # 2—that the illegally-obtained evidence was not used in the questioning of the witness—also points toward admission of the testimony. As stated above, we find persuasive SA Neukam's testimony that he did not confront Alexander with the evidence the ISP obtained from its unlawful search of Justice's van.[2] We also find persuasive Alexander's testimony that the police never told him that they found his name in Justice's briefcase or in Armenta–Baeza's address book.

Factor # 3 looks at the amount of time that elapsed between the illegal search and the contact with the witness. For example, if the police discovered the witness in the course of the illegal search and in possession of contraband, then there is a "heavy weight upon [that] man's shoulders" to cooperate with authorities. *Padilla,* 960 F.2d at 862. In this case, Alexander was not discovered at the time of the search of Justice. Nor was he found as a direct result of that search. At most, all that can be said is that the police discovered evidence to *corroborate* Alexander's story that he and Justice were connected. Therefore, factor # 3 also points toward admissibility.[3]

Finally, factor # 4 measures the nature of the police's knowledge of the relationship between the witness and the defendant as it existed before the illegal search. If the police would not have discovered the witness except for the illegal search, then the grounds for exclusion are more compelling. *See Ramirez–Sandoval,* 872 F.2d at 1397–98. In this case we cannot help but notice that the government derived the connection between Justice and Alexander from its investigation of *Alexander,* not Justice. Indeed, Sergeant McClure of the ISP stated that the ISP's investigation of Justice would have died but for the fortuitous arrest and inter-

2. Although Neukam admits showing Alexander a hotel receipt found in the briefcase some time in March of 1994, he did so only after Alexander had volunteered information concerning a meeting with members of the Salt Lake group at a Chicago hotel. In other words, the evidence was used to corroborate Alexander's story rather than to coerce his cooperation.

3. Moreover, a year has elapsed since Alexander first cooperated with the government. This period of time has "afforded the witness a chance for extended reflection indicating that" his testimony is the product of free choice. *Hamilton,* 781 F.2d at 627.

view of Alexander. Thus, this factor also suggests that his testimony be admitted.[4]

In sum, the balance of factors suggests that Alexander's testimony is not the kind of "tainted fruit" envisioned by *Ceccolini* as warranting suppression. This is not a case where Alexander was "discovered as a direct result of the illegal search, [or was] implicated thereby in illegal activity." *Ramirez–Sandoval*, 872 F.2d at 1398 (*quoting United States v. Rubalcava–Montoya*, 597 F.2d 140, 143 (9th Cir.1978). Nor can we say that his cooperation was inextricably linked to the government's unlawful search of Justice's van. Because the costs of excluding this live-witness testimony would greatly outweigh the marginal deterrent effect, we find that the relationship between the unlawful seizure and Alexander's cooperation is so attenuated as to dissipate the taint. Accordingly, Alexander's testimony is admissible.

### (2). Testimony of the Other Coconspirators.

The Defendant next seeks to suppress the testimony of Justice's remaining coconspirators. He argues *inter alia* that investigators used an address book found in his briefcase to identify Javier Armenta–Baeza, Manuel Armenta–Baeza, Charles O'Neal, Harvest Buddy Thomas, III, John Robert Carter, Jr., Louis Jordan, Willie Johnson and Michelle Simmons. As a result, their testimony is the fruit of the poisonous tree.

However, for reasons similar to those discussed above, the Court finds that the government has established an independent basis for the admissibility of this testimony. Neither the discovery of these additional witnesses, nor their cooperation with the government is closely connected to the ISP's illegal search of Justice's van. Rather, the government discovered the connection between Justice and these witnesses from its investigation of Alexander.

The importance of Jeffrey Alexander to the government's case now becomes clear. During the course of numerous debriefings, Alexander has disclosed the identities of Javier Armenta–Baeza, Louis Jordan, Willie Johnson, Michelle Simmons, Charles O'Neal, John Robert Carter, Harvest Buddy Thomas and a confidential informant. These witnesses have in turn revealed still more details about the internal workings of the drug conspiracy. Because the Court has already found Alexander's testimony to be admissible, the evidence that the government discovered from Alexander is also admissible.

Moreover, the government developed leads on many of these witnesses from means independent of both Justice and Alexander. John Robert Carter, for example, was arrested with cocaine in Cedar Rapids, Iowa, on October 26, 1993. Significantly, the rental car he was driving at the time of his arrest was rented by Justice in Salt Lake City, Utah using Justice's credit card. Similarly, Manuel Armenta–Baeza, Harvest Buddy Thomas and Charles O'Neal were arrested on January 26, 1994, in Chicago when they delivered approximately five Kilograms of cocaine to an undercover officer. Because each of those witnesses agreed to plead guilty to those charges and cooperate with the government, they too were discovered by independent means.[5]

### C. Suppression of Physical Evidence-

Finally, the Defendant has moved to suppress "any physical evidence accumulated by police or government agents as a result of exploitation of the aforesaid illegal search and seizure." (Motion to Suppress Testimonial and Physical Evidence, at p. 1). He fails, however, to identify any specific items.

---

**4.** Factor # 5 examines whether the investigating officers made the illegal search with the intent of finding a willing and knowledgeable witness to testify against Justice. Since neither party elicited testimony that directly spoke to this factor at the hearing or addressed it in their briefs, we do not consider it here.

**5.** The Defendant also moved to suppress the testimony of Salvador Garcia–Baeza. We note, however, that neither side has explained either the identity or discovery of Garcia–Baeza. In his Memorandum in Support of Motion to Suppress, for example, the Defendant does not contend that Garcia–Baeza's discovery by government agents was in any way connected to the illegal search of Justice's van. Because we refuse to speculate as to his discovery, our ruling today does not pertain to him and must wait for a later day.

Although the Court hesitates to speculate as to the nature of those items, we nevertheless feel that the parties are entitled to some guidance in this area.

First, any items which were found during the unlawful search of Justice's van are clearly inadmissible as the fruit of the poisonous tree. The briefcase and firearm seized from the van, for example, undoubtedly fall within this category. The same is true for the contents of the briefcase, which include *inter alia* an address book, mobile telephone records, Western Union wire transfer records, motel receipts, money order receipts, rental car receipts and various business cards. Finally, as the government concedes, it will not be able to introduce any evidence obtained as a result of any leads it received from inspection of the contents of the briefcase, to-wit: Justice's cellular telephone number, a pager number, and one Western Union wire transfer of $280 from Justice to Michelle Simmons, which was not provided to SA Neukam in response to a January 4, 1993, subpoena. (See Exhibit B, Government's Opposition Brief).

The evidentiary chain as to other items of physical evidence is more unclear, however. As a result, the Court will not opine as to their admissibility at this stage.

## III. CONCLUSION

For the reasons stated above, Defendant's motion is DENIED IN PART and GRANTED IN PART.

It is so ORDERED.