STATE of Iowa, Appellee,

v.

Reed Wayne HAMILTON, Appellant.

No. 67906.

Supreme Court of Iowa.

June 15, 1983.

John C. Wellman, Polk County Offender Advocate, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen. and Shirley Ann Steffe, Asst. Atty. Gen., for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, LARSON, and SCHULTZ, JJ.

LARSON, Justice.

This defendant appeals from his convictions of first-degree murder and voluntary manslaughter, Iowa Code sections 707.1–.2 and 707.4. The trial court erred, he claims, in admitting evidence he contends was "tainted fruit" of a confession which had been suppressed by an earlier court order, in denying his motions for mistrial based on alleged misconduct by the prosecutor, and in submitting a felony-murder instruction. We affirm.

## I. *The Facts.*

On the afternoon of January 25, 1978, Nick Pappas, Jr., and Cathy Larson, his fiancee, were found shot to death in the Pappas home in Des Moines. The following day, January 26, Reed Hamilton was observed in a car outside his residence in West Des Moines, acting "strangely" and clad only in a bathrobe, despite severely cold weather. West Des Moines police went to Hamilton's residence to investigate, following a citizen's report of the incident. Hamilton told them several armed men had come to his house and threatened to retaliate against him for the death of Nick Pappas, Jr., the brother of one of them. The officers' investigation failed to reveal any evidence of these "intruders," however, their interest had been piqued by Hamilton's mention of the murder victim, Pappas, and by a quantity of marijuana discovered by them. They had also noticed an empty handgun holster in Hamilton's residence.

Hamilton was arrested for drug possession and taken into custody. Upon questioning by Des Moines police officers, Hamilton admitted being at the Pappas home on the day of the killings, but denied his involvement. He said he had purchased some marijuana and left before anyone was shot. He stated he first went to his home, which was shared by his fiancee, Diane Nystrum, then to a local store, then to his mother's home. One of the officers present at the interrogation told Hamilton he did not believe this account and said it conflicted with statements taken from other persons, including Diane Nystrum. The defendant

then said that he "needed help." The officer responded that the officers "would help him if they could," and at this point, according to the later order of suppression, the confession became "tainted" by the suggestion of help. Hamilton then gave a complete statement of his involvement in the killing of Pappas and Larson. In this version, he stated he had shot the victims and that he had taken approximately ten pounds of marijuana and one ounce of cocaine from the Pappas home; that he took the marijuana to his mother's home where he placed it in a suitcase and hid it in the basement, then he went to "a river" to dispose of the gun and, while walking on the ice, fell in.

Hamilton moved to suppress the statement on the ground it was not voluntary. After an evidentiary hearing, Judge A.B. Crouch suppressed that part of the statement which was given after the promise of help. The court refused, however, to suppress the part of the statement which preceded the offer of help. This order began a long series of legal battles. Hamilton petitioned for a writ of certiorari, claiming the court should have gone further and suppressed all custodial statements by him as violative of his rights under *Miranda.* The State applied for discretionary review, arguing that none of the statements should have been suppressed. These applications were granted, consolidated for argument, and presented to the court of appeals, which upheld the rulings.

Back in district court, the matter proceeded to trial, resulting in a first-degree murder conviction in the death of Cathy Larson and a voluntary manslaughter conviction as to Pappas. On appeal, this court reversed and remanded on an issue not involved in this appeal. *State v. Hamilton,* 309 N.W.2d 471 (Iowa 1981). This appeal follows his convictions of both crimes at the second trial.

## II. *The "Fruit of the Poisonous Tree" Argument.*

Hamilton contends that testimony of seven of the State's witnesses had been "taint-

ed" by his suppressed confession and it was error to allow them to testify at trial. This issue may be resolved summarily as to some of the witnesses; others will require analysis of the "fruit of the poisonous tree" doctrine.

■ A. *The procedural issues.* One witness whose testimony is challenged was James Rowley, a police investigator and night supervisor at the jail where Hamilton was being held. He testified that at approximately 4:30 a.m. on the morning following the confession, he took Hamilton to the first floor of the jail to make the customary telephone call, which had apparently been overlooked earlier. The basis of Hamilton's objection to Rowley's testimony is not clear. Rowley did not relate the substance of the telephone call, nor did he relate, except in chambers in the absence of the jury, a spontaneous statement by Hamilton that he was in a "mess" for having killed the two victims. There is no showing that the mere fact a telephone call was made could have been the "fruit" of that confession. We reject Hamilton's argument as to this witness.

We also summarily dispose of the "tainted fruit" argument as it pertains to two other prosecution witnesses: Officer Gerald Limke and former assistant county attorney Robert Burnett. Limke testified, on rebuttal, that Maxine Hamilton had told Officer Haviland, in their presence, that Hamilton had admitted the killings in his early morning telephone call from the jail. No objection was made to Limke's testimony. As to Burnett, the only objection was that it was hearsay. In neither instance was error preserved on the "tainted fruit" grounds now urged, and we will not consider them.

B. *Other challenged evidence.* Other testimony claimed to be tainted by the confession included that of Hamilton's mother, Maxine Hamilton, who testified the defendant borrowed a handgun from her "a month or so at least" before the shooting and that on the day of the shooting he brought a suitcase (later established to contain marijuana) to the basement of her home. She also testified about a late telephone call

from Hamilton, in which he had admitted killing Pappas and Larson and had asked her to remove the suitcase from her basement. She testified she took the suitcase to the home of a friend, Ann Morrison, but later retrieved it and delivered it to the police, at Hamilton's request.

Witness Paul Lincoln, who was living with Hamilton's mother at the time of the killing was also challenged as a witness on the same ground. He testified that on the evening of the killing, the defendant arrived at the residence and went to the basement. After the defendant left, Lincoln went down to the basement where he looked inside a suitcase and saw two green bags containing a substance that looked like "some kind of tobacco" and had a "strange smell." Lincoln's testimony also confirmed that Maxine Hamilton had received a telephone call from the defendant and that he and Maxine then took the suitcase to the home of Ann Morrison.

Similar objections were raised as to the testimony of Ann Morrison, the temporary custodian of the suitcase. She testified that at approximately 5:00 a.m. on January 27, she received a phone call from Maxine Hamilton. Shortly thereafter, Maxine Hamilton arrived at her apartment and asked her to keep a suitcase; Maxine retrieved it later that day.

The testimony of investigator Edwin Kracht is also claimed to be a fruit of the defendant's tainted statements. He testified regarding the amount of time which elapsed and the number of miles driven on a route to various points starting at the victims' home. At the trial, the defendant claimed that Kracht's testimony was nothing more than a retracing of the route he had told the police about during their illegal interrogations of him and therefore was inadmissible.

Of all of these challenged witnesses, only one, the defendant's mother, was actually identified by the defendant in his statement. He argues that the testimony of the other witnesses (except Kracht) is nevertheless tainted, because the police discovered them only through their contacts with de-

fendant's mother. Since her testimony was tainted, he argues, so is the testimony of the others. If this is so, that the testimony of all of these witnesses rises or falls with that of Mrs. Hamilton, then the issue must be resolved against the defendant as to all of them, because we conclude Mrs. Hamilton's testimony was not tainted by the confession.

### III. *Legal Principles.*

Nearly seventy years ago the United States Supreme Court enunciated the exclusionary rule in order to discourage disregard for constitutional guarantees, requiring the suppression at trial of evidence discovered as a result of illegal government activity. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Later, the concept was expanded to include other, indirect, evidence "tainted" by the original illegality. *Silverthorne Lumber Company v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939), the graphic phrase "fruit of the poisonous tree" was conceived by Justice Frankfurter to illustrate the concept. While the "fruits" doctrine is applied most frequently in fourth amendment cases, it is applicable in cases involving the fifth amendment. *See,* 3 W. LaFave, *Search and Seizure* § 11.4, at 613–14 (1978).

█ The purpose in excluding such evidence is twofold: to deter lawless police conduct and to protect the integrity of the judiciary. *Brown v. Illinois,* 422 U.S. 590, 599–600, 95 S.Ct. 2254, 2259–60, 45 L.Ed.2d 416, 424–25 (1975). Three exceptions to application of the exclusionary rule have been recognized. Courts have sought to strike a balance between the policy of the exclusionary rule and the public interest in effective law enforcement.

One exception permits use of other evidence when intervening events or circumstances independent of the primary illegality have so attenuated the causal connection as to dissipate the taint of the unlawful police action. *E.g., United States v. Ceccol-*

*ini,* 435 U.S. 268, 279–80, 98 S.Ct. 1054, 1061–62, 55 L.Ed.2d 268, 278–79 (1978). Evidence may also be admissible if the government inevitably would have discovered it without the aid of the unlawful police conduct, in accordance with the limited version of the "inevitable discovery" rule. *Brewer v. Williams,* 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424, 441 (1977). *See also United States v. Wilson,* 671 F.2d 1291, 1294 (11th Cir.) *cert. denied,* —— U.S. ——, 103 S.Ct. 98, 74 L.Ed.2d 89 (1982); *United States v. Brookins,* 614 F.2d 1037, 1042 n. 2, 1044–49 (5th Cir.1980). *Silverthorne,* the case first announcing the tainted evidence principle, noted another rather obvious exception: If the evidence in question was obtained from a source independent of the primary illegality, it is not subject to exclusion as tainted fruit, 251 U.S. at 385, 40 S.Ct. at 182, 64 L.Ed.2d at 321. While the State urges all three exceptions in this case, we believe the identity of Mrs. Hamilton was obtained through a source independent of the tainted confession, and it is unnecessary to consider the other exceptions.

█ In cases involving claims of tainted evidence, the State has the ultimate burden of persuasion to show its evidence is admissible. The defendant, however, must, in the first instance, go forward with specific evidence of a nexus between the illegality and the evidence, in order to raise the issue. *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176, 192 (1969); *Nardone,* 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312; *United States v. Allard,* 600 F.2d 1301, 1305–06 (9th Cir.1979); *United States v. Cella,* 568 F.2d 1266, 1284–85 (9th Cir.1977).

In a case such as the present one, where the claim is that the evidence was independently discovered, an interesting question arises as to whether it is a problem of showing the nexus between the confession and the evidence, which must be shown by the defendant, or one of showing the "independent source" exception to the tainted fruit rule. While we have some doubt about the sufficiency of Hamilton's threshold showing of the connection between the

confession and these witnesses, we will assume he adequately established this nexus and that the State must bear the ultimate burden of showing an exception.

The police interrogation of Hamilton must be divided into two distinct segments, that preceding the suggestion of help and that following it. The interrogation began at police headquarters at approximately 9:20 p.m. on the day following the shooting. Hamilton was properly advised of his *Miranda* rights, and no issue is raised in that regard. The interrogation continued without a problem until approximately 11:00 p.m., when the suggestion of help was made, and the tainting of the confession allegedly occurred. During this pre-tainting segment of the interrogation, Hamilton furnished considerable information. He said he had gone to the victims' house between 3:00 and 3:30 p.m. on the day of the shooting and that Nick Pappas and Cathy Larson were there at that time. He said he purchased some marijuana from Pappas and left for home, where he and his fiancee, Diane Nystrum, stayed until about 8:00 p.m. when they went shopping and to his mother's house before returning home. He stated that just prior to going to bed, Diane had seen a shadow outside the house and that he had gone upstairs to get his shotgun. He said he had sat up all night to protect the home with his shotgun. The officers then asked him if he had any guns besides the shotgun. Hamilton replied that he had a .38 caliber revolver and, when asked where it was, responded that it was "over to his mother's house." (Investigation of the killing had established that a .38 caliber weapon had been used.) Immediately following the defendant's statement about his revolver being at his mother's house, several of the officers left the interrogation room to type up a search warrant application for the mother's house, apparently for the gun and marijuana. It was at this point, when the other officers had left, that Hamilton asked the remaining officer to lock the door and confided to the officer that he "needed help." The officer's response that he would try to help, according to the trial court's suppression order, then tainted the remainder of the statement.

Before the tainting occurred, the identity and possible involvement of Hamilton's mother were known to the officers. The later, tainted, portion of the statement, more clearly focused on the extent of her involvement and contradicted portions of his earlier statement as it pertained to her. For example, in the second half of his statement, he said the gun was not at his mother's house as he originally said but was, in fact, on the bottom of a river. Nevertheless, at the point at which the tainting occurred, the police had already learned about the mother's involvement; their investigation was far from an aimless search for evidence which was dependent for direction upon anything Hamilton said later. The police knew at that point the mother's house had figured prominently in Hamilton's activities the previous day and had good reason to believe both the marijuana and murder weapon could be found there.

■ When evidence is first obtained by lawful means and is only reinforced by the results of later illegal police conduct, it is not inadmissible under the tainted fruit doctrine. *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980) (witness' identity and potential value as witness established prior to illegal seizure and "he was not a 'found' witness" whose existence became known to the authorities only as a consequence of the illicit search); *United States v. Cella*, 568 F.2d at 1286 (information obtained prior to allegedly illegal seizure); *see McCormick's Handbook of the Law of Evidence* § 177, at 413 (2d ed. E. Cleary 1972) ("[W]here the challenged evidence is discovered before the police activity becomes illegal, it is not causally related to the subsequent illegality."); LaFave, *supra*, § 11.4, at 675–76 (prior knowledge as factor showing attenuation between illegality and evidence).

■ We conclude that the testimony of the defendant's mother was not tainted by any illegality in the interrogation of Hamilton. The testimony of Lincoln and Morri-

son was properly admitted for the same reason: their identity and potential value as witnesses were not mentioned in, nor found as the result of the confession. They came to light when the police pursued their leads through Mrs. Hamilton.

■ The challenge to Edwin Kracht's testimony is based upon slightly different grounds. It is not claimed that his identification was tainted because of any relationship with Hamilton's mother, as it is with the other witnesses. Rather, it is claimed that Kracht's testimony was based upon a second interrogation of Hamilton, which had also been suppressed.

Shortly after the defendant's first statement was given at police headquarters, his attorney requested that the police conduct no further interrogation. The police ignored that request, however, by relaying questions to Hamilton through his fiancee. The court suppressed the evidence gained through this procedure on the ground that Nystrum was, in effect, an agent of the police and that this three-way conversation was in fact a police interrogation. A part of this three-way interrogation occurred when police officers, accompanied by Hamilton and Nystrum, retraced by car Hamilton's route following the murder, as he related the details of it to the officers, through Nystrum. Investigator Edwin Kracht, testified, over objection, about driving this route and as to the times and distances involved in going from point to point.

The State argues that Kracht did not testify as to any of the actual statements made by Hamilton during this interrogation, or even that a conversation had occurred. He testified only as to the times and distances involved in traveling between various points. And, while Hamilton had told the officers about the various points on the route during both illegal interrogations, there was independent evidence, not based upon either interrogation, as to Hamilton's presence, at fairly definite times at each point along the route. Douglas Millin, a witness for the State, testified that Hamilton was at the Pappas residence at approximately 5:30 p.m. on the day of the shooting.

Another witness, Martin Grund, testified Hamilton had arrived at his house, wearing wet clothing, at approximately 6:00 p.m. Kracht's testimony as to the times and distances involved had sufficient bases, independent of the statements, to be admissible over the defendant's "tainted fruit" objection. Both Millin and Grund had volunteered their help to the police, and their testimony is not claimed to be tainted.

IV. *Claims of Prosecutorial Misconduct.*

■ The defendant claims error in the trial court's refusal to grant a mistrial on the ground the prosecuting attorney, in his opening statement, said he intended to establish certain facts which, the defendant claims, could only have been acquired through the confession. We do not agree. All of these facts were testified to by witnesses whose testimony was properly admitted for the reasons discussed in Division II.

Hamilton also asserts error in the court's denial of his mistrial motion based upon the State's final argument. The prosecuting attorney had said, as to a defense psychologist, that "maybe he knows a little bit more about the case than he's willing to admit." Hamilton claims this was a violation of the Iowa Code of Professional Responsibility for Lawyers as an expression of an attorney's opinion on the credibility of witnesses. *See* DR 7–106(C)(4). A similar issue is raised as to a statement that "I think there had been a theft of drugs" in connection with the killings, thereby providing a basis for felony murder.

■ We do not resolve the question of whether these statements violated the ethical rule cited, nor do we hold that, even if they did, it would be grounds for mistrial. Even assuming the comments were improper, they were not so egregious that they could not be adequately remedied by the trial court's admonition, which was immediately given to the jurors, that the statements were improper and must be disregarded by them. A trial court is given considerable discretion in ruling on mistrial motions under these circumstances. *State*

*v. Williams,* 315 N.W.2d 45, 56 (Iowa 1982). *See generally State v. Williams,* 328 N.W.2d 504, 505 (Iowa 1983).

■ The prosecuting attorney also prompted a mistrial motion when he argued that "there's ample evidence clearly in this case, evidence of a first-degree murder as to both Nick Pappas and Cathy Larson," because the defendant was only charged with voluntary manslaughter, not murder, as to the shooting of Pappas. Again, the trial court promptly admonished the jury to "disregard any argument that charges a crime greater than voluntary manslaughter with respect to Nick Pappas." This admonition was sufficient to deal with the problem and the trial court did not abuse its discretion in overruling the mistrial motion.

## V. *The Felony Murder Instruction.*

■ The trial court instructed the jury that it could find Hamilton guilty of first-degree murder if it found Cathy Larson was murdered while Hamilton was perpetrating a robbery. Iowa Code § 707.2(2). Hamilton contends there was not adequate evidence, outside Hamilton's confession, that a robbery had occurred. We do not agree. There was evidence that Pappas was a drug dealer, that within about an hour after the killings, Hamilton brought a large quantity of marijuana to his mother's house and, when investigation of the killings began to focus on him, he immediately had it removed from his mother's house. The jury could infer from these facts that the marijuana had, in fact, been taken from the Pappas home. The court did not err in submitting the felony-murder instruction.

We find no reversible error.

AFFIRMED.