# IN THE COURT OF APPEALS OF IOWA

No. 21-0756
Filed June 15, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**GOWUN PARK,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dallas County, Brad McCall, Judge.

The State appeals the suppression of all statements Gowun Park made to officers at her condominium and in subsequent police interviews. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Gina Messamer and Tammy Gentry of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**VAITHESWARAN, Presiding Judge.**

The State charged Gowun Park with first-degree murder and first-degree kidnapping in connection with the death of her husband. Park moved to suppress statements she made to law enforcement officers. The district court granted the motion. On the State's interlocutory appeal, we must decide (1) whether Park was in "custody" at her condominium; (2) whether Park knowingly, intelligently, and voluntarily waived her *Miranda* rights during her first interrogation at the police station; (3) whether the detectives who questioned Park during the first police station interrogation made improper promises of leniency; and (4) whether suppression of Park's statements during her second, third, and fourth interviews with law enforcement officers was required if improper promises of leniency were made during the first station interview.

## I.  *Custody—Home Questioning*

Park called 911 to report that her husband was unconscious. Paramedics responded and began cardio-pulmonary resuscitation. Shortly thereafter, four West Des Moines police officers, including a detective who later questioned Park at the police station, arrived at the condominium. Body cameras documented the encounter. Ultimately, officers transported Park to the police station for further questioning.

Park moved to suppress all statements she made at her condominium on the ground that the officers' questioning violated her right against self-incrimination under the Fifth Amendment to the United States Constitution. She cited *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), which held, "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial

interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Those procedural safeguards have come to be known as "*Miranda* warnings" or "*Miranda* rights." *See State v. Hillery*, 956 N.W.2d 492, 501 (Iowa 2021). The Supreme Court articulated the warnings as follows:

> [The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.

Applying *Miranda*, the district court determined "Park was 'in custody'" in the condominium. The court acknowledged "she was certainly not under arrest" but stated "there was significant restraint on her freedom of movement." The court concluded, "Because she was not read her *Miranda* rights before questioning began, statements made by Park, whether inculpatory or exculpatory, must be suppressed."

On appeal, the State argues Park was not in custody at any time during the home encounter. Park responds that she only seeks suppression of the statements she made twenty-five minutes and twenty seconds into the encounter. In light of her concession, we will focus on the interactions from that point forward, reviewing the constitutional issue de novo.

The legal framework for determining whether a person is in custody is well established:

> Custody occurs upon formal arrest or under any other circumstances where the suspect is deprived of his or her freedom of action in any significant way. This standard seeks to apply the

> *Miranda* requirements to coercive atmospheres, not just coercive places. It uses a case-by-case evaluation of all the circumstances existing at the time of the interrogation.

*State v. Schlitter*, 881 N.W.2d 380, 395 (Iowa 2016) (internal quotations omitted), *abrogated on other grounds by State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). The test is based on "objective circumstances, not the subjective belief of the officers or the defendant." *State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009). Four factors bear on the test: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning." *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997).

It is undisputed that officers did not summon Park; she initiated the encounter by calling 911. *See State v. Underwood*, No. 12-2319, 2014 WL 467576, *4 (Iowa Ct. App. Feb. 5, 2014) ("The police did not summon [the defendant]. They found him asleep on his living room couch after being let into the home by [his partner]."); *cf. State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003) (noting the defendant did not "initiate contact with the police"). Although an officer later asked Park to move to her bedroom, the officer used conversational language to summon her, stating, "We can go in here and talk"; "We're gonna go in here and talk real quick, okay?"; and "Here we can go in here. Yep, you can bring the water bottle if you want . . . . Yep, we can go in here and talk, okay? Just go ahead and step in here." The first factor, then, supports a determination that the encounter was noncustodial.

We turn to "the purpose, place, and manner of interrogation." *Countryman*, 572 N.W.2d at 558. Twenty-five minutes into the encounter, the officers were still attempting "to ascertain what had happened," a consideration that weighs against a finding of custody. *See State v. Tyler*, 867 N.W.2d 136, 173 (Iowa 2015). Although they asked about the circumstances that led to the condition of Park's husband, their open-ended questions were not styled to elicit a confession. *See id.*; *see also State v. Davis*, No. 08-1942, 2009 WL 4116322, at *5 (Iowa Ct. App. Nov. 25, 2009) (stating the manner of questioning was "direct, non-confrontational, investigative in nature, and not coercive or threatening"). As discussed, the questioning took place in Park's home, a location that is generally deemed to be noncustodial. *See State v. Evans*, 495 N.W.2d 760, 762 (Iowa 1993). And, during the questioning, Park was not deprived of the comforts of home. *Cf. Miranda*, 672 N.W.2d at 760 (noting defendant was removed from the bedroom where he was lying down with the lights off, and brought into the living room, where officers handcuffed and questioned him). True, Park was asked to remain in the bedroom until paramedics took her husband to the hospital. But she was never handcuffed and, when she returned to the living room, she freely moved about that area. While several officers questioned her, they did so sequentially and in a non-coercive fashion. The purpose, place, and manner of questioning weighs against a finding of custody.

On the third factor—whether and to what extent the defendant was confronted with evidence of guilt—Park points to a comment by the detective that "this is very weird." A reasonable person would have viewed the comment as a

frank appraisal of the situation rather than a comment on Park's guilt. The third factor does not support a finding of custody.

The final factor assesses "whether the individual was free to leave the place of questioning." *Schlitter*, 881 N.W.2d at 397. "One element of this is the degree of physical restriction placed on the individual." *Id.* Courts examine the exit paths available to a suspect, whether those paths are blocked by officers, placement of physical restraints such as handcuffs, and whether officers tell suspects they are free to leave. *See id.* at 397–98.

The officers did not go "to the residence with a preconceived plan to arrest" Park. *See Davis*, 2009 WL 4116322, at *5. As noted, they also did not handcuff her and they allowed her to move about the living room area. Although they blocked the bedroom door, failed to tell Park she was free to leave the room or the condominium, and denied her request to go to the hospital, we are not convinced that conduct transformed an otherwise noncustodial setting into a custodial setting. *Cf. Bogan*, 774 N.W.2d at 681 ("Although [the defendant] was allowed to roam freely in the office area behind the counter, armed police officers remained at the only exit."); *State v. Itoh*, No. 09-0811, 2010 WL 1578527, at *5 (Iowa Ct. App. Apr. 21, 2010) ("Once the defendant was told to wait, instead of being free to go, however, the circumstances weigh heavily in favor of the interrogation being custodial.").

On our de novo review, we conclude a reasonable person in Park's shoes would not have understood herself to be in custody during the first in-home encounter. Accordingly, we reverse the suppression of Park's statements to law enforcement officers made while she was in the condominium.

## II. *Waiver of* Miranda *Rights—First Police Station Interrogation*

Park moved to suppress statements she made during her first police station interrogation on the ground that she did not knowingly, intelligently, and voluntarily waive her *Miranda* rights.  She asserted the State could not "carry its burden to prove [she] had a full awareness of her rights or the consequences of abandoning her right," nor could "the State prove that her waiver was a product of a free and deliberate choice, rather than coercion and deception."  The district court agreed with Park and set forth the following reasoning:

> Based upon the nature and circumstances of the questioning, the Court is unable to conclude Park had a full awareness of both the nature of her *Miranda* rights and the consequences of a decision to abandon them.  Most telling is her statement, "I'm not so sure," when asked if she understood her rights.  Accordingly, Park's statements to officers at the police station on the night of the incident must be suppressed.

Again, our review of the court's ruling is de novo.  *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010).

The United States Supreme Court described a waiver of *Miranda* rights as follows:

> *Miranda* holds that the defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently.  The inquiry has two distinct dimensions.  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and citations omitted); *accord Tyler*, 867 N.W.2d at 174 ("In order to execute a valid waiver of one's *Miranda* rights, the waiver must be made knowingly, intelligently, and voluntarily."); *Palmer*, 791 N.W.2d at 845 (requiring State to prove "two facts," the first addressing the knowing and intelligent prongs and the second addressing the voluntary prong). As with the "in custody" inquiry, "[c]ourts use an objective standard to determine whether a defendant's waiver" is knowing, intelligent, and voluntary. *State v. Hajtic*, 724 N.W.2d 449, 453–54 (Iowa 2006).

The State concedes the first police station interview was a custodial interrogation requiring the reading of *Miranda* rights and a valid waiver. With respect to the waiver, the State largely focuses on the knowing and intelligent prongs. We begin there.

Park argues her status as a native Korean speaker rendered her *Miranda* waiver unknowing and unintelligent. On our de novo review, we disagree. Park lived in the United States for two decades, obtained her doctorate in the United States, and was a college professor who taught her courses in English. *See id.* at 454 (finding a *Miranda* waiver voluntary where a videotape confirmed the defendant's ability to understand English and he had lived in the United States for six years and attended a public school until eleventh grade); *cf. State v. Ortiz*, 766 N.W.2d 244, 253 (Iowa 2009) (concluding the State did not meet its burden to show the defendant waived his *Miranda* rights knowingly and intelligently where the State "failed to establish [the defendant] spoke and understood English," the officer "gave [the defendant] a written warning that made no sense," and the literal translation did not "contain the essence of *Miranda*"). When Park did not

understand the meaning of a word, she asked for clarification. *See Hatjic*, 724 N.W.2d at 454 (noting the defendant "showed no reluctance to ask questions if he did not understand"). Although she initially appeared confused when a detective said her *Miranda* rights would be read to her and she equivocated when asked if she understood the rights, she eventually read the sheet listing those rights and invoked her right to counsel. We conclude Park's waiver of her *Miranda* rights was knowing and intelligent.

The more difficult question is whether Park's waiver of her *Miranda* rights was voluntary. Park cites several factors that, in her view, rendered her *Miranda* waiver involuntary, including deception by the detectives. We will begin with that factor.

"[T]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). "The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Id.*; *accord Tyler*, 867 N.W.2d at 174–75 ("[A] *Miranda* waiver is involuntary only when it is shown to be the product of police misconduct or overreaching."). "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

After Park arrived at the station, two detectives interrogated her. As noted, one of the detectives was also at Park's home. There, he fielded ten inquiries from

Park about her husband's condition, as well as a request to go to the hospital, a request he deflected.

Before the officers began questioning Park at the police station, the detective who had interacted with Park at the condominium said, "Ok, I still don't know what's going on with your husband." In fact, he knew precisely what was going on—Park's husband passed away before the detectives began the interrogation. That initial deceptive statement was not isolated.

Shortly after the first detective misrepresented the condition of Park's husband, Park asked, "Ok, is he ok?" The second detective responded, "We're waiting to find out." He cited a federal privacy law and told Park "the moment I get a text message or call, I will tell you, ok?" When Park asked again if her husband was "breathing now," the second detective responded, "Well, I can't tell you that. I don't know for sure." His statement, like that of the first detective, was untrue.

The deception did not end there. The first detective chimed in, "As soon as we know something we'll tell you, ok." The second detective then said, "We need to ask you some questions and figure out kind of what le[]d up to what's going on so we can give the doctors and everybody some information."

After these exchanges, the first detective speedily read Park her *Miranda* rights. Park questioned her right to remain silent, asking "[u]m, meaning, um" and "I'm not sure what I . . . ." The first detective gave her a written summary of her rights, after which Park asked, "Can you talk after I find out about my husband?" The first detective responded,

> Well, we need, we need to be able to talk to you at the same time because maybe you know something that helps him. You know what I'm saying? Like, I don't know your situation. I don't know his

situation. *Could he have eaten something that hurt him, you know? Could he had taken a medication that he's allergic to? We need to be able to talk to you and ask you questions to figure out if there's something we can tell the hospital that will help him out. So we gotta talk to you now.*

(Emphasis added.) Park said "OK" and followed up with, "Then can I talk to doctor then?" The first detective replied, "Well, the doctors are helping him right now so we can't even talk to the doctors right now. Our officers down there are standing by while they are trying to help him. Ok, because they got to do their job to the best of their abilities, alright?" Park then asked about the document in front of her. The second detective explained it was "a legal document" to "make sure" she understood "her rights" before they talked to her. Park asked, "If I'm willing not to talk to you right now then can I talk to you later?" The first detective responded, "Well, we want to talk to you right now, ok."

The detectives unquestionably used trickery to get Park to talk. *Cf. Tyler*, 867 N.W.2d at 175 (noting "the special agents did not engage in any deceptive tactics during the questioning"). During the suppression hearing, the first detective was asked why he waited an hour and a half to tell Park her husband had died. He candidly responded, "Because we still weren't getting any information from her." While the detective's subjective intent is not dispositive, a reasonable person in Park's shoes would surmise that the deception was designed to circumvent her right to remain silent.

The detectives' misrepresentations also masked Park's right to be warned that anything she said could be used against her. *See Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884, 894 (11th Cir. 2003) (finding a *Miranda* waiver involuntary where investigators told the defendant that talking to them "honest[l]y wouldn't hurt

him," which "contradicted the *Miranda* warning that anything he said could be used against him in court"); *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) ("It appears that by telling [the defendant] that signing the waiver would not hurt him the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [the defendant] concerning the consequences of relinquishing his right to remain silent."); *cf. Tyler*, 867 N.N.W.2d at 176 (noting officers asked defendant if she would prefer they come back later, to which the defendant responded, "You can talk to me"). The detectives effectively turned Park's right to remain silent on its head. Their trickery, employed immediately before and after the first detective read Park the *Miranda* warnings, was the single psychological pressure point that the detectives knew might bear fruit. *Cf. Colorado v. Spring*, 479 U.S. 564, 574 (1987) (concluding waiver of Fifth Amendment privilege was voluntary where the defendant alleged no "coercion of a confession by . . . deliberate means calculated to break [his] will" (internal quotation marks and citation omitted)).

We recognize "deception standing alone does not render a waiver of constitutional rights involuntary as a matter of law unless the deceiving acts amount to a deprivation of due process." *See State v. Cooper*, 217 N.W.2d 589, 597 (Iowa 1974). In *Cooper*, the court found a prosecutor's lie about the death of the defendant's wife did not rise to the level of a due process violation. *Id.* at 597. But the court "call[ed] attention to the fact" that no "false promises of assistance were made to Cooper if he would give a statement regarding his shooting." *Id.* at 595.

That is not the case here. The detectives wove their false assertions about the condition of Park's husband into their reading of Park's *Miranda* rights, and they repeatedly underscored the urgency of speaking to them in order to facilitate his treatment. Their deception amounted to a due process violation.

Another supreme court opinion, *State v. Jacoby*, 260 N.W.2d 828, 833 (Iowa 1977), is inapposite for the same reason. There, officers questioned a suspect who was believed to have shot and killed her husband. *Jacoby*, 260 N.W.2d at 831–32. They obtained a signed waiver of her *Miranda* rights. *See id.* at 832. After the defendant verbally confessed to the shooting, the officers learned that the husband passed away. *See id.* They did not tell the defendant about the death until she signed a statement of confession. *See id.* The supreme court concluded the officers "practiced no substantial deceit relating to the gravity of [the husband's] condition or the charges defendant might face" and it did not appear they "made any promises that defendant would be allowed to visit [the husband] at the hospital if she cooperated with them at the station." *Id.* at 832–33. The absence of deceit distinguishes *Jacoby* from the facts of this case.

While the detectives' deceit is the most salient factor in finding the *Miranda* waiver involuntary, other factors also support our conclusion. Park did not sign the written waiver form. *Cf. Tyler*, 867 N.W.2d at 175 (stating the defendant's signature on the waiver form was "strong proof that [the defendant] executed a voluntary waiver"). And, when one of the detectives belatedly informed Park of her husband's death, she broke down, slid off her chair and lay on the floor for an extended period of time. *Cf. id.* (noting the defendant "never lost control or had a breakdown").

Finally, as will be discussed, the detectives made promises of leniency.  *Cf. id.* (noting "the special agents never threatened [the defendant], nor did they make any promises of leniency in exchange for her cooperation"); *Jacoby*, 260 N.W.2d at 833 (concluding *Miranda* waiver was voluntary based in part on the absence of "any promises that defendant would be allowed to visit [her husband] at the hospital if she cooperated with them at the station"). Those promises, together with the officers' deception about the death of Park's husband, Park's failure to sign the *Miranda* waiver form, and her reaction to the news of her husband's death, rendered the *Miranda* waiver involuntary.  Based on the involuntariness of the waiver, the district court acted appropriately in suppressing all statements Park made during the first police station interrogation.

### III.     *Promises of Leniency—First Police Station Interrogation*

Park asserted her statements during the first police station interrogation had to be suppressed because they were induced by promises of leniency.  The district court found no "express promise of leniency" but examined "whether the language used was sufficient to justify a reasonable belief in the accused that if [s]he confessed [s]he would receive more lenient treatment or some special consideration not available if [s]he denied [] guilt."  The court found:

> The officers interviewing Park repeatedly assured her they were there to help her and protect her.  They focused on her status as a "battered woman" and told her she was safe with them.  They said they "get it if he's hurting you.  We don't want him to hurt you."  They told her if she had reacted based on the abuse her husband inflicted on her "people would understand that."

The court further found, "All of these statements, viewed in the context in which they were made, gave Park false hope that if she simply reacted to an abusive

situation, she would not be in trouble." The court concluded, "[T]he assurances the officers gave her during the extended interview at the police station amounted to implied promises of leniency in exchange for her admissions. The circumstances and declarations of the officers were calculated to mislead Park as to her position and exert an improper influence over her mind."

The district court applied an evidentiary test in concluding the officers made promises of leniency. "The test 'is whether the language used amounts to an inducement which is likely to cause the subject to make a false confession.'" *State v. Howard*, 825 N.W.2d 32, 40 (Iowa 2012) (quoting *State v. Mullin*, 85 N.W.2d 598, 602 (Iowa 1957)); *accord State v. Madsen*, 813 N.W.2d 714, 727 (Iowa 2012) (quoting *State v. Hodges*, 326 N.W.2d 345, 349 (Iowa 1982)) ("The line between admissibility and exclusion seems to be crossed, . . . if the officer also tells the suspect what advantage is to be gained or is likely from making a confession."). "If the district court finds the evidentiary test does not require exclusion, it should [] employ the totality-of-the-circumstances test to ensure the State has met its burden of establishing that defendant's confession was voluntary." *Madsen*, 813 N.W.2d at 726 n.1. Our review of the district court's ruling is for corrections of errors at law. *Hillery*, 956 N.W.2d at 500 (quoting *Howard*, 825 N.W.2d at 39).

The State contends "the challenged statements did not identify benefits to be given or external consequences to be avoided by confessing." Park counters, "The detectives led [her] to believe that they would protect her if she told them she was abused by her husband and admitted her involvement in his death."

Several statements support Park's contention. One of the detectives said:

And *people understand when a woman gets hurt*. When she gets beat. When she gets choked until she's going to pass out then eventually, you know, just like if I take this bowl of water and I keep pouring more water in it. It can only hold so much water. At some point it's going to overflow. Alright, same thing, a woman that's getting abused she can take a little bit here, a little bit there. A little bit there it just adds up. It builds up. Eventually it's going to overflow. Something is gonna happen. Something has got to change. *So it's reasonable for people to understand.* I'm sure you've seen lifetime movies. There's tons of lifetime movies out there. A woman gets beaten, she's getting abused by her husband, something happens, she takes it into her own hands. She poisons him. She does something to make it stop. To make it go away and *people get that. They related to it. They understand. Now if I was getting treated like that, I would do something, too. I would do something to make it stop. So if that's the case, tell us that because people would understand that.*

(Emphasis added.) The detective's assertion that if *he*—a law enforcement officer—was "getting treated like that," *he* "would do something to make it stop" and "people would understand that" implied Park would be justified in harming her husband if he physically abused her. *See Howard*, 825 N.W.2d at 41 (stating detective's "repeated references to getting help combined with his overt suggestions that after such treatment [the defendant] could rejoin [his family] conveyed the false impression that if [he] admitted to sexually abusing [the child] he merely would be sent to a treatment facility similar to that used to treat drug and alcohol addiction in lieu of further punishment"); *State v. Zarate*, No. 11-0530, 2012 WL 652449, at *8 (Iowa Ct. App. Feb. 29, 2012) (concluding "the officer's statements that the prison time [the defendant] would eventually serve for the crime was 'up to him' left the false impression that the suspect would receive more lenient treatment if he admitted his participation in the armed robbery"); *State v. Dennis*, No. 04-1614, 2006 WL 126794, at *2 (Iowa Ct. App. Jan. 19, 2006) (finding promises of leniency in a detective's repeated suggestion that, "If you didn't have

the knife in your hand and you didn't stab the guy, what do you have to worry about").

The detectives pursued this line of questioning for some time. The following statements are instructive:

- After referring to physical abuse, *"We're trying to help you here* cause we're having doctors, we're having apartment— the neighbors in the apartment tell us they have had heard fighting over and over and over."
- "If he was physically beating you, tell us, tell us dear. Tell us what happened. Ok, take some drink of water. *We are here to help you.* Hey, hey, shhh, you gotta open your eyes. Ok, *we're gonna help you dear."*
- "And nobody deserves that, *It's not your fault*, you know, you didn't deserve for him to treat you that way."
- "Are you a battered woman? If you were doing this to protect yourself, then tell us" and "We're trying to help you. Protect you, if you will."
- "*If this was an accident* or something. You need to tell us that."
- "[I]f something happened today and then somehow he got hurt, *that's okay. If you didn't mean for him to get hurt.* If it was his idea . . . and something happened *that's fine.* We just need to know."
- "You're *safe with us.* You are *safe in here."*

(Emphasis added.)

We recognize promises to help a suspect, when viewed in a vacuum, may not rise to promises of leniency. *See State v. Bunker*, 13-0600, 2014 WL 957432, at *1–2 (Iowa Ct. App. Mar. 12, 2014) (concluding detective's statement, "I can only help you if you're honest with yourself" did not amount to promissory leniency); *State v. Foy*, No. 10-1549, 2011 WL 2695308, at *2–3 (Iowa Ct. App. July 13, 2011) (concluding investigator's statements "[w]e're not going to be any bit of any help to you," if the defendant "did not tell the truth" and "[w]e're just here simply for your benefit" did not amount to promises of leniency). But the promises to help

Park were tied to the detectives' repeated suggestion that physical abuse by Park's husband propelled and mitigated Park's conduct. *See Mullin*, 85 N.W.2d at 600, 602 (concluding an officer's statement that "[m]ore mercy is going to be granted to you by the authorities if you tell the truth" crossed the line rather than "skating up closely to the line," as the district court found, because "these statements were such as might well raise in the mind of the accused the hope that if he made the so-called confession he would receive better treatment, less severe punishment, and more mercy than if he denied his guilt"); *see also State v. McCoy*, 692 N.W.2d 6, 29 (Iowa 2005) (finding promissory leniency where a detective stated, "approximately twenty-two times . . . that if he didn't pull the trigger, he wouldn't be in any trouble"). The detectives' use of physical abuse by Park's husband to obtain a confession and their related offers to help and protect Park amounted to impermissible promises of leniency.

The detectives also attempted to elicit a confession by asking Park to consider the effect of her husband's death on his parents. Specifically, one of the detectives stated:

> Cause here's the thing at some point too we're gonna have to get ahold of his mom and dad and we're gonna have to explain to them what happened, ok, and I don't know his mom and dad sounds like dad beat him. I don't know if his mom was nice or if his mom was mean to him or what not, but we are gonna have to try to explain to them what happened. At this point, we don't understand, but I certainly wouldn't want to tell somebody that their son killed themselves if that was not the case. I would think, you know, at least they deserve to know what really happened.

Exploitation of relative connections supports a finding of promissory leniency. *See Howard*, 825 N.W.2d at 41 (finding reference to ability to rejoin family amounted to promise of leniency); *Madsen*, 813 N.W.2d at 718 (finding promissory leniency in

the statement, "You don't want your family . . . to open the Messenger and see your photograph and see my name saying that you're under investigation for this, this, this . . . you want it over with now, right"); *State v. Polk*, 812 N.W.2d 670, 676 (Iowa 2012) (noting courts "have cried foul when interrogators imply a confession will" affect their children); *Zarate*, 2012 WL 652449, at *7 ("In this case, although [the officer] did not introduce the topic of the suspect's family into the conversation, his appeal to [the defendant's] relationship with his son contributed to the overbearing of the suspect's will at the time of his confession.").

It is worth noting that the detectives did not revoke their promises of leniency. *See State v. Kase*, 344 N.W.2d 223, 226 (Iowa 1984) (noting the promises of leniency "had not been retracted prior to [the defendant's] statements on" the following day). While the State asserts the detectives accused Park of lying toward the end of the interrogation and their accusation amounted to a revocation of any promises of leniency, precedent requires more explicit disclaimers. *See Howard*, 825 N.W.2d at 41 (noting that the detective "did not counter [a] false impression with any disclaimer that he could make no promises"); *State v. Whitsel*, 339 N.W.2d 149, 153 (Iowa 1983) (noting law enforcement officers "emphasized . . . that they could not make any promises or give any guarantee").

"Under our evidentiary test, a confession can never be received in evidence where the prisoner has been influenced by any threat or promise." *Madsen,* 813 N.W.2d at 724 (internal quotation marks and citations omitted). The promise renders a confession involuntary under the law of evidence. *See State v. Quintero*, 480 N.W.2d 50, 52 (Iowa 1992) ("Our cases have long reversed criminal

convictions for admitting involuntary confessions. The rule was developed, not as a constitutional principle, but because the law has no way of measuring the improper influence or determining its effect on the mind of the accused. . . . We hold that [the defendant's] involuntary confession was inadmissible, not on the basis of a constitutional principle, but as a matter of the law of evidence."); *Mullin*, 85 N.W.2d at 603 ("[T]he officer's statements must be held to have legally prevented the confession from being free and voluntary, and it should therefore have been rejected by the court. For this reason, and this reason alone, the conviction must be set aside and the defendant granted a new trial."); *see also Hillery*, 956 N.W.2d at 499 ("[A] confession can never be received in evidence where the prisoner has been influenced by any threat or promise. This per se rule deters police from using a tactic that might induce the innocent to confess falsely." (internal quotation marks and citation omitted)). Because the promises of leniency rendered Park's statements in the first interrogation involuntary, the district court did not err in suppressing them.

As discussed in Part II, the involuntary *Miranda* waiver required suppression of all the statements made during the first interrogation. Accordingly, we need not address the State's assertion that promises of leniency alone would require suppression of only those statements made after the promises were made. *See Howard*, 825 N.W.2d at 39–40. We also need not address the State's contention that statements made after the promises of leniency should not have been suppressed because the statements were "denials rather than admissions."

*IV.*      *Effect of Promises of Leniency on Subsequent Interviews*

Following the first interrogation, Park was allowed to leave. She voluntarily returned to the police station just under eight hours after the first interview. She was re-interviewed by the same detectives and was again allowed to leave at its conclusion. Two days later, the detectives interviewed Park a third time at her condominium. The following day, Park again returned to the station for a fourth interview.

The district court suppressed Park's statements from these interviews, concluding "the taint" of the "implied promises" of leniency made during the first interview "carried over to all of the subsequent interviews." Citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985), the State argues the court's approach "only applies when the initial statements were *involuntary*." We agree. But, in *Elstad*, the Court took pains to emphasize that an initial un-*Mirandized* statement was un-coerced. *See Elstad*, 470 U.S. at 314 (stating, "Absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion"). The Court stated, "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case." *Id.* at 312. As discussed, the detectives in this case employed deception and promises of leniency during the first interview to elicit statements from Park. And, in contrast to *Elstad*, where the officers cured the "procedural" infirmity by later *Mirandizing* the defendant, the officers here did

not disclaim the promises of leniency. Those promises rendered her statements during the first interrogation involuntary, making it entirely appropriate for the district court to apply the "taint" theory to subsequent interviews.

Several factors are relevant to this theory. "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310 (citations omitted). Other evidence may be used "when intervening events or circumstances independent of the primary illegality have so attenuated the causal connection as to dissipate the taint of the unlawful police action." *State v. Hamilton*, 335 N.W.2d 154, 158 (Iowa 1983) (citation omitted).

As noted, the second interview was conducted at the police station just hours after the first by the same detectives who promised leniency during the first interrogation. Although Park came in voluntarily, the effect of the earlier promises had not dissipated. If anything, the interview highlighted the continuing weight those promises carried. The promises "created a lingering motivation for [the defendant] to keep talking during the subsequent interviews." *Zarate*, 2012 WL 652449, at *9. The State cites no intervening events that might have disrupted the effect of the initial promises of leniency. We conclude the district court did not err in suppressing Park's statements made during the second interview.

The same holds true for the third and fourth interviews. A minimal amount of time elapsed between those interviews and the first interrogation. They were conducted by the same detectives. Although the third interview took place in Park's condominium, nothing about that setting ameliorated the earlier promises

of leniency.  We conclude the district court did not err in suppressing Park's statements made during the third and fourth interviews.

## V.    *Disposition*

We affirm the district court's suppression of all statements made during the first, second, third, and fourth interviews.  We reverse the suppression of all statements made after officers entered Park's condominium in response to the 911 call.  We remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**